Alan Harris (SBN 146079)
Priya Mohan (SBN 228984)
HARRIS & RUBLE
655 North Central Ave.
Glendale, California 91203
Telephone: (323) 962-3777
Facsimile: (323) 962-3004
aharris@harrisandruble.com
pmohan@harrisandruble.com

John P. Dorigan (SBN 98964)
LAW OFFICES OF JOHN P. DORIGAN
600 Canterbury Lane
Sagamore Hills, Ohio 44067
Telephone: (330) 748-4475
Facsimile: (330) 748-4475
jpdorigan@aol.com

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| G. PEDERSON, R. ALCARAZ, and S. MASON, individually and on behalf of all others similarly situated, and on behalf of aggrieved employees, the people of the State of California and the Labor Commissioner,<br><br>        Plaintiffs,<br><br>    v.<br><br>AIRPORT TERMINAL SERVICES, INC., RICHARD B. HAWES, and SALLY A. LEIBLE,<br><br>        Defendants. | Case No. 5:15-cv-02400-VAP-SP<br>*Assigned to Hon. Virginia A. Phillips*<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CONDITIONAL CERTIFICATION OF SETTLEMENT CLASS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:      April 9, 2018<br>Time:     2:00 p.m.<br>Courtroom: 8A<br>        350 West 1st Street<br>        Los Angeles, CA 90012 |

i

1

2      **PLEASE TAKE NOTICE** that, on April 9, 2018, at 2:00 p.m.., in Courtroom 8A

3  of the above-entitled Court located at 350 West 1st Street, Los Angeles, California

4  90012—or at such other date, time, or place as the Court may designate—Plaintiffs

5  Gideon Pederson, Ruth Alcaraz and Sasha Mason will move for an order granting

6  preliminary approval of a class-wide settlement reached in the above-captioned action, as

7  well as for conditional certification of the Settlement Class defined in the Settlement

8  Agreement and General Release ("Settlement Agreement").[1]  The Motion will be made

9  and based upon this Notice of Motion; the Memorandum of Points and Authorities

10  appended hereto; the Declarations of Alan Harris, John Dorigan, Gideon Pederson, Ruth

11  Alcaraz and Sasha Mason filed herewith; all of the pleadings, papers, and documents

12  contained in the file of the within action; and such further evidence and argument as may

13  be presented at or before the hearing on the Motion.

14      The required Local Rule 7-3 meet-and-confer took place commencing on January

15  8, 2018, and on various dates thereafter.  (See March 9, 2018, Decl. of Alan Harris in

16  Supp. of Mot. for Preliminary Approval of Class-Action Settlement & Conditional

17  Certification of Settlement Class ("Harris Decl.") ¶ 1.)

18

19  Dated:  March 9, 2018                           Respectfully submitted
                                                    HARRIS & RUBLE
20                                                  LAW OFFICES OF JOHN P.
                                                    DORIGAN
21
                                                    _____/s/ *Alan Harris*_____
22                                                  Alan Harris
23                                                  John P. Dorigan
                                                    *Attorneys for Plaintiffs*
24

25

26

27  _____
    [1] Unless otherwise noted, capitalized terms herein have the meanings set forth in the
28  Settlement Agreement.

# TABLE OF CONTENTS

I.    Introduction ...................................................................................1

II.   Summary of the Litigation's Claims and of the Relevant Procedural
      History .......................................................................................2
      A.    Plaintiffs' Initiation of this Action .......................................2
      B.    Class Counsel's Investigation ............................................3
      C.    Mediation and Court-Ordered Stay .....................................4
      D.    Scheduling Conference and Continued Settlement Efforts.........4
      E.    Settlement...................................................................4
      F.    The Specific Claims for Relief Alleged in this Action ............5

III.  Summary of the Settlement Agreement ........................................8
      A.    The Gross Settlement Payment and Net Settlement Fund .......8
      B.    The Estimated Recovery To Class Members ........................10
      C.    Additional Non-Monetary Relief .....................................11
      D.    Incentive Awards and Attorney's Fees ..............................12
      E.    Notice to the Class........................................................14
      F.    Release Provisions and Opting Out...................................16

IV.   The Court Should Conditionally Certify the Settlement Class and
      Should  Preliminarily Approve the Settlement Agreement...........16
      A.    Class Certification Is Warranted .....................................16
      B.    The Settlement Meets the Requirements for Preliminary
            Approval ................................................................19
            i.    Settlement Negotiations Were Conducted at Arm's
                  Length ..........................................................19
            ii.   The Settlement Has No Obvious Deficiencies ...........20
            a.    The Strength of Plaintiffs' Case............................20
            b.    The Likely Duration of Further Litigation...............22
            c.    The Risk of Maintaining Class-Action Status Through
                  Trial ............................................................22
            d.    The Settlement Amount Offered.............................23
            e.    The Extent of Discovery and Stage of the Proceedings .........23
            f.    The Experience and Views of Counsel....................24
            g.    The Reaction of Class Members to the Proposed
                  Settlement.....................................................24

V.    Conclusion ................................................................25

PLS.' NOT. OF MOT. AND MOT. FOR PRELIMINARY APPROVAL; MEM. OF P. & A. IN SUPP. THEREOF

1

# TABLE OF AUTHORITIES

2

CASES

Adames v. Mitsubishi Bank, Ltd.,
  133 F.R.D. 82 (E.D.N.Y. 1989).................................................................17
Amgen, Inc. v. Conn. Ret. Plans & Trust Funds,
  133 S. Ct. 1184 (2013).............................................................................18
Angeles v. US Airways, Inc.,
  2013 WL 622032 (N.D. Cal. filed Feb. 19, 2013)..................................21
Blackwell v. Skywest Airlines, Inc.,
  2008 WL 5103195 (S.D. Cal. filed Dec. 3, 2008)..................................21
Boeing Co. v. Van Germet,
  444 U.S. 472 (1980).................................................................................13
Brinker Rest. Corp. v. Superior Court,
  53 Cal. 4th 1000 (2012)...........................................................................23
Campbell v. First Investors Corp.,
  2012 WL 5373423 (S.D. Cal. filed Oct. 29, 2012) ................................13
Cicero v. DirecTV, Inc.,
  2010 WL 2991486 (C.D. Cal. filed July 27, 2010) ................................14
Craft v. County of San Bernardino,
  624 F. Supp. 2d 1113 (C.D. Cal. 2008) ..................................................14
Dunleavy v. Nadler,
  213 F.3d 454 (9th Cir. 2000) .......................................................17, 20, 23
D'Alauro v. GC Servs. Ltd. P'ship,
  168 F.R.D. 451 (E.D.N.Y. 1996).............................................................17
Elliott v. ITT Corp.,
  150 F.R.D. 569 (N.D. Ill. 1992) ..............................................................18
Garcia v. Bana,
  2013 WL 621793 (N.D. Cal. filed Feb. 19, 2013).....................................8
Hanlon v. Chrysler Corp.,
  150 F.3d 1011 (9th Cir. 1998) .................................................................20
Helm v. Alderwoods Group, Inc.,
  2011 WL 5573837 (N.D. Cal. filed Nov. 15, 2011).................................12
Hopkins v. Stryker Sales Corp.,
  2013 WL 496358 (N.D. Cal. filed Feb. 6, 2013).....................................14
In re NASDAQ Market-Makers Antitrust Litig.,
  187 F.R.D. 465 (S.D.N.Y. 1998).......................................................22, 23
In re Warfarin Sodium Antitrust Litig.,
  212 F.R.D. 231 (D. Del. 2002) ................................................................23

iv

Int'l Union v. Gen. Motors Corp.,
   497 F.3d 615 (6th Cir. 2007) ........................................................15

Joseph v. Gen. Motors Corp.,
   109 F.R.D. 635 (D.C. Colo. 1986) ................................................18

Kakani v. Oracle Corp.,
   2007 WL 2221073 (N.D. Cal. filed Aug. 2, 2007)........................11

Linney v. Cellular Alaska P'ship,
   151 F.3d 1234 (9th Cir. 1998) ................................................17, 24

Officers for Justice v. Civil Serv. Comm.,
   688 F.2d 615 (9th Cir. 1982) ........................................................17

Ordonez v. Radio Shack, Inc.,
   2013 WL 210223 (C.D. Cal. filed Jan. 17, 2013) ........................23

Rodriguez v. West Publ'g Corp.,
   563 F.3d 948 (9th Cir. 2009) ........................................................12

Rodriguez v. West Publ'g Corp.,
   2007 WL 2827379 (C.D. Cal. filed Sept. 10, 2007)........................8, 22, 23, 24

Rowe v. N.H. Motor Transp. Ass'n,
   552 U.S. 364 (2008)........................................................................21

Sandoval v. Tharaldson Employee Mgmt., Inc.,
   2010 WL 2486346 (C.D. Cal. filed June 15, 2010) ....................11

Singer v. Becton Dickinson & Co.,
   2010 WL 2196104 (S.D. Cal. filed June 1, 2010)........................14

Smith v. CRST Van Expedited, Inc.,
   2013 WL 163293 (S.D. Cal. filed Jan. 14, 2013)...............11, 12, 13

Smith v. Lux Retail N. Am., Inc., No. C 13-01579 WHA,
   2013 WL 2932243 (N.D. Cal. June 13, 2013).................................7

Staton v. Boeing Co.,
   327 F.3d 938 (9th Cir. 2003) ........................................................15

Torrisi v. Tucson Elec. Power Co.,
   8 F.3d 1370 (9th Cir. 1993) ..........................................................20

Van Vranken v. Atl. Richfield Co.,
   901 F. Supp. 294 (N.D. Cal. 1995)...............................................12

Vasquez v. Coast Valley Roofing, Inc.,
   266 F.R.D. 482 (E.D. Cal. 2010).......................................11, 13, 14

Wal-Mart Stores, Inc. v. Dukes,
   131 S. Ct. 2541 (2011)...................................................................17

Wren v. RGIS Inventory Specialists,
   2011 WL 1230826 (N.D. Cal. filed Apr. 1, 2011) .......................12

Yokoyama v. Midland Nat'l Life Ins. Co.,
   594 F.3d 1087 (9th Cir. 2010) ......................................................19

<u>Young v. Polo Retail, Inc.,</u>
   2006 WL 3050861 (N.D. Cal. Oct. 25, 2006) .................................................. 19

STATUTES

49 U.S.C. § 41713 .................................................................................................. 20
Cal. Bus. & Prof. Code § 17200 *et seq.* ............................................................... 3
Cal. Civ. Proc. Code § 338 ...................................................................................... 8
Cal. Lab. Code § 203 ........................................................................................... 1, 3

RULES

Fed. R. Civ. Proc. 23(c)(1) ..................................................................................... 23
Fed. R. Civ. Proc. 23(a) .......................................................................................... 17
Fed. R. Civ. Proc. 23(b)(3) ..................................................................................... 19
Fed. R. Civ. Proc. 23(c)(2)(B) ............................................................................... 15
Fed. R. Civ. Proc. 23(a)(2) ..................................................................................... 17
Fed. R. Civ. Proc. 23(b) .......................................................................................... 19
Fed. R. Civ. Proc. 23(c)(3) ..................................................................................... 15

REGULATIONS

8 Cal. Code Regs. 11090 § 14(A) ................................................................. 3, 5, 6, 7

## I.   Introduction

Plaintiffs Ruth Alcaraz, Gideon Pederson, and Sasha Mason ("Plaintiffs") and Defendant Airport Terminal Services, Inc. ("ATS") have reached a $600,000 settlement of the class-wide claims alleged in the above-captioned action, a settlement which has achieved significant changes in ATS policies as well as a gross cash recovery of over $200 per employee.[2]  Plaintiffs now move for preliminary approval of the settlement and conditional certification of the Settlement Class.

In this action, Plaintiffs contend that ATS did not: (i) provide meal period premium wages for those occasions when employees were not provided with adequate meal periods, (ii) provide adequate wage statements; (iii) failed to reimburse employees for uniform-related expenses; (iv) provide restitution of withheld uniform deductions and (v) failed to pay correct overtime. Plaintiffs contend that ATS's alleged failures have resulted in a violation of the Labor Code's requirement that all wages due and owing be paid to former employees upon the termination of their employment, resulting in exposure to payment of penalties under section 203 of the California Labor Code (the "Code").

Under the terms of the Settlement Agreement, a Gross Settlement Payment of $600,000 will be tendered to compensate employees for the alleged violations.[3]  After deducting amounts for requested attorney's fees (not to exceed $200,000) and costs (not to exceed $12,000), estimated claims-administration expenses (not to exceed $27,000), class representative incentive awards ($500 to each Plaintiff) and individual payments to Plaintiffs on account of their execution of broad general releases of the claims articulated in the litigation, claims for retaliation and discrimination arising thereafter and their agreement to refrain from seeking future employment with Defendant ($4,500 to each Plaintiff)[4], the PAGA penalty payment to the Labor Workforce and Development Agency ($7,500), and the security deposits and interest held by ATS as of January 1, 2018

---

[2] The Declarations of Plaintiffs Pederson, Alcaraz and Mason are attached as Exhibits 3, 4 and 5 respectively to the March 9, 2018 Declaration of Alan Harris ("Harris Decl.")
[3] Capitalized terms herein are the same as defined in the Settlement Agreement.
[4] These payments are requested to be made to each Plaintiff in addition to their $500 representation fee.  (Dorigan Decl. ¶ 8.)

PLS.' NOT. OF MOT. AND MOT. FOR PRELIMINARY APPROVAL; MEM. OF P. & A. IN SUPP. THEREOF

($50,956.45) a minimum of $287,544 will remain for distribution to the Settlement Class

as a whole, with the security Deposit Sums also being returned to the specific workers

who had previously tendered them to ATS.  Accordingly, assuming 100% participation

by the approximately 2,842 members of the Settlement Class, the plan of allocation

specified by the Settlement Agreement will provide an average net payment of $101

dollars per class member.  Of course, a 100% participation rate is unlikely for any class.

As explained below, because the Gross Settlement Payment is non-reversionary,

participating Settlement Class members will receive significantly more than $100 each.

All told, this is an outstanding result, particularly in light of the arguably *dispositive*

*airline-industry defenses* applicable to each of Plaintiffs' claims, discussed *infra*.  The

settlement should therefore be approved.  (Harris Decl., ¶ 2.)

## II.    Summary of the Litigation's Claims and of the Relevant Procedural History

### A.    Plaintiffs' Initiation of this Action

In November of 2015, Plaintiffs commenced this action on behalf of a putative

class of all current and or former employees employed by Defendant within California at

any time from November 20, 2011.  On January 25, 2016, Plaintiffs filed a first amended

complaint to clarify that they were authorized to pursue claims under the California

Labor Code Private Attorneys General Act of 2004, Code section 2698 et seq. ("PAGA").

On April 14, 2016, Plaintiffs filed the operative Second Amended Complaint ("SAC"),

asserting twelve causes of action:  (1) a claim for missed meal breaks under Code

sections 226.7 and 512; (2) a claim for improper pay stubs under section 226(a) of the

Code; (3) a claim alleging that ATS failed to reimburse employees for uniform-

maintenance expenses under section 2802 of the Code; (4) a claim for failing to properly

deal with security deposits under sections 403-406 of the Code, as well as section 9(c) of

the Wage Order; (5) a claim for unlawful deductions from wages, in violation of Code

section 221; (6) failure to pay proper overtime in violation of sections 510 and 1194 of

the Code; (7) failure to pay all wages as required by Code sections 201, 201.3(B)(1) and

continuing wages under section 203 of the Code; (8) a claim for unfair competition under section 17200 *et seq.* of the California Business and Professions Code; (9) a claim violation of the FLSA; (10) individual claims for failure to produce records requested under section 226(b) of the Code; (11) individual claims for failure to produce records under section 1198.5 of the Code; and (12) a claim for civil penalties under section 2698 *et seq.* of the Code. The civil-penalties claim is premised in part on the ATS failure to provide adequate seating for its employees, as required by section 14 of the wage order,[5] as well as the ATS violations of Code provisions and Wage Order requirements with respect to treatment of security deposits.[6]

### B.    Class Counsel's Investigation

Both before initiating the Action and afterwards, Class Counsel investigated the claims against Defendant and also analyzed any and all applicable defenses raised by Defendant. Class Counsel's investigation included work conducted in connection with a prior class action lawsuit, <u>Collette McDonald v. Airport Terminal Services</u>, No. 5:11-cv-01946-VAP-SP (C.D. Ca. 2011). Class Counsel's investigation also included the exchange of information and documentation pursuant to informal discovery methods, service of formal discovery, numerous conferences between Class Counsel and Defendant's Counsel, and Class Counsel's interviews of Plaintiffs and Class Members.

In connection with these attempts at resolution, ATS's counsel provided information as to the class size, and the number of automatic meal period deductions taken during the relevant period when employees worked shifts of more than five hours

---

[5] The SAC alleges that ATS failed to provide its employees with adequate seating. In this regard, IWC Wage Order 9 states that ―[a]ll working employees shall be provided with suitable seats when the nature of the work reasonably permits the use of seats.‖ 8 Cal. Code Regs. 11090 § 14(A).
[6] Plaintiffs contend that the ATS practice of taking uniform deductions from Plaintiffs' and Airport Agents' paychecks violates Code §§ 403, 404, and 405, giving rise to civil penalties under 2699 (f) (2). Defendant ATS commingled the earned but unpaid wages of Plaintiffs and Airport Agents with other funds of ATS in violation of Code § 405. ATS failed and refused to pay interest to workers on the return of such deposits. According to Cose section 2699.5: "The provisions of subdivision (a) of Section 2699.3 apply to any alleged violation of . . . 403 [requiring segregated deposit of cash bonds, and a written agreement signed by employer and employee detailing the conditions] [and] subdivision (b) of Section 404 [requiring return of deposit with interest]."

per day.  ATS also provided information regarding required security deposits and alternative workweek elections.  (Harris Decl. ¶ 3.)

### C. Mediation and Court-Ordered Stay

After extensive negotiations, including several settlement offers and counteroffers, the Parties agreed that the services of a private mediator would assist in resolving Plaintiff's claims.  (Harris Decl. ¶ 4.)  On or about August 9, 2016, the Parties attended a mediation before Lisa Klerman, an experienced mediator of cases involving the wage and hour laws at issue in the Action. The Parties were unable to reach a mediated resolution. On or about September 1, 2016, the Court stayed the Action through November 7, 2016, to permit the Parties and mediator to continue efforts to attempt to settle the Action. (Harris Decl. ¶ 4.)

### D. Scheduling Conference and Continued Settlement Efforts

On or about January 30, 2017, the Parties appeared before the Court for a scheduling conference. The Parties continued to meet and confer on numerous occasions, reviewing Plaintiffs' claims, the alleged defenses, the potential for a mediated resolution of the Action. On or about May 12, 2017, the Court stayed the Action through August 7, 2017. The Parties and mediator continued to meet and confer to explore the potential for settlement. (Harris Decl. ¶ 5.)

### E. Settlement

After more than 16 months of negotiations and exchange of information between the Parties following the initial mediation, the Parties finally agreed to a settlement, and on or about January 4, 2018, the Parties filed a notice of settlement. The settlement was negotiated in light of all known facts and circumstances—including the potential difficulty of proving Plaintiffs' claims, potential defenses, the uncertainty associated with litigation, the risks of significant delay, and numerous potential appellate issues.  The settlement was reached only after extensive arm's-length negotiations, with the assistance of the mediator Lisa Klerman. Over the course of the next two months, the Parties proceeded to negotiate the terms of a long-form settlement agreement encompassing the

terms of the Memorandum of Understanding.  (Harris Decl. ¶ 6.)  In March 2018, those negotiations resulted in the execution of the Settlement Agreement that is presently before the Court for preliminary approval.  (Harris Decl. ¶ 6, Ex. 1.)

### F.    The Specific Claims for Relief Alleged in this Action

#### i.    Meal Break Violation

The relevant Industrial Welfare Commission ("IWC") wage order provides that "[n]o employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes."  8 Cal. Code Regs. § 11090 subsec. 11(A).  See also Code § 512(a) (stating that "[a]n employer may not employ an employee for a work period of longer than five hours per day without providing the employee with a meal period of not less than 30 minutes").  Under the Code, "[i]f an employer fails to provide an employee a meal period . . . in accordance with an applicable order of the [IWC], the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each work day that the meal . . . period [wa]s not provided."  Code § 226.7(b).  As alleged in the SAC, the nature of ATS's hourly employees' work at airport worksites at times prevented them from taking their meal breaks.  During discovery, Class Counsel were able to establish that there were some 2,422 instances when they might prove liability for premium wages on account of missed meals on a class-wide basis.  Assuming an average hourly wage of $14.77, the total damages would amount to $35,772.94 (=$14.77*2,422).  (Harris Decl., ¶ 7.)

#### ii.    Unpaid Overtime

Investigation uncovered a dispute between the parties with respect to whether ATS complied with the technical requirements for an employee election to permit an alternative workweek of four days, ten hours per day, all paid at straight time wages. There were only some sixty persons impacted, and the total claim for unpaid overtime came to less than some $12,500.  In addition, Plaintiffs claimed that ATS improperly computed overtime owing to many employees on account of failing to properly compute the applicable regular rate.  The total damages for this part of the overtime claim came to

under $60,000.  (Harris Decl., ¶ 8.)

### iii.    Wage Statement Violation

In addition to failing to provide adequate meal-period premium wages, Plaintiffs contend that Defendant failed to provide them with adequate pay stubs.  In this regard, section 226 of the Code provides:

> (a)    Every employer shall, semimonthly or at the time of each payment of wages, furnish each of his or her employees, either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash, an itemized statement in writing showing (1) gross wages earned, (2) total hours worked by the employee, except for any employee whose compensation is solely based on a salary and who is exempt from payment of overtime under subdivision (a) of Section 515 or any applicable order of the Industrial Welfare Commission, . . . and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee and . . . **if the employer is a temporary services employer as defined in Section 201.3, the rate of pay and the total hours worked for each temporary services assignment**.
>
> . . . .
>
> (e)    An employee suffering injury as a result of a knowing and intentional failure by an employer to comply with subdivision (a) is entitled to recover the greater of all actual damages or fifty dollars ($50) for the initial pay period in which a violation occurs and one hundred dollars ($100) per employee for each violation in a subsequent pay period, not exceeding an aggregate penalty of four thousand dollars ($4,000), and is entitled to an award of costs and reasonable attorney's fees.

Code § 226 (emphasis supplied).  Similarly, IWC Wage Order 9 requires an employer to keep time records of meal periods unless all operations cease during such periods.  See 8

Cal. Code Regs. 11090 § 7(A)(3).

Plaintiffs allege that Defendant failed to provide Airport Agents with the data required by section 226(a) of the Code.  The wage statements fail to record properly the additional wages owed to Plaintiffs on account of overtime wages owing to them.  Although ATS is a temporary services employer, the wage statements also fail to provide the rate of pay and total hours worked for each temporary services assignment.  The total damages are capped at $4,000 per employee, limited to the period commencing one year prior to the filing of suit.  During the relevant time, the company employed hundreds of workers who collectively received many thousands of wage statements.  The total at issue, with PAGA penalties, comes to several million dollars.  In the settlement, this sum is substantially discounted, as there are substantial problems in establishing liability and courts are unlikely to reward stacked penalties for a violation that the defense claims to by hyper-technical in nature.  (Harris Decl., ¶ 9.)  Smith v. Lux Retail N. Am., Inc., No. C 13-01579 WHA, 2013 WL 2932243, at *4 (N.D. Cal. June 13, 2013) (refusing to "pile one penalty on another for a single substantive wrong" and noting that "no actual holding in any judicial decision has ever blessed such stacking.").

### iv.    Failure to Reimburse for Uniform Maintenance Expenses

The SAC alleges that ATS failed to reimburse hourly employees for the costs of maintaining their uniforms, despite the fact that certain parts of the uniforms have a label: "dry clean only."  Under section 2802 of the Code, an employer is required to "indemnify his or her employee[s] for all necessary expenditures or losses incurred by the employee[s] in direct consequence of the discharge of [their] duties."  Code § 2802(a).  Plaintiffs contend that uniform-maintenance expenses are a "necessary expenditure" for which ATS bears the burden of reimbursement.  See 8 Cal. Code Regs. § 11090 subsec. 9(A) (stating that, "[w]hen uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer").  Damages here were estimated to apply to about 600 full time equivalent workers who, over a year would spend about $5 per dry cleaning per month,

1    about $36,000 per year (=600 FTEs*$5*12 months).  (Harris Decl., ¶ 10.)

2                    **v.    Unlawful Deductions**

3    The SAC alleges that, in violation of Code section 221, ATS unlawfully deducted

4    uniform deposits from the paychecks of Airport Agents.  As of January of 2018, the total

5    retained by ATS, including accrued interest, came to just over $50,000.   (Harris Decl., ¶

6    11.)

7                    **vi.    Liability for Code § 203 Continuing Wages**

8    Plaintiffs contend that at least on account of Defendant's failure to pay Airport

9    Agents proper overtime wages, as well as Defendant's failure to provide meal-period

10   premium wages, Defendant is liable to former employees for continuing wages pursuant

11   to section 203 of the Code.  To the extent the case were not settled and continuing wages

12   were awarded, the total would come to several million dollars.  For one employee,

13   continuing wages could come to some $3,544.80 (=$14.77 per hour*8 hours per day * 30

14   days).  Were liability established for 2,000 employees, the total penalty would be

15   $7,089,600.  Here, in settlement, such penalties are completely discounted.  Rodriguez v.

16   West Publ'g Corp., 2007 WL 2827379 at *8 (C.D. Cal. filed Sept. 10, 2007).

17   **III.    Summary of the Settlement Agreement**

18          **A.    The Gross Settlement Payment and Net Settlement Fund**

19   The Settlement Class consists of all non-exempt employees who were employed by

20   ATS within California from November 20, 2011 (*i.e.*, four years prior to the filing of the

21   Complaint), to the date that the Court grants preliminary approval of the Settlement

22   Agreement.[7]  (Harris Decl., Ex. 1 at ¶ 1.5.)

23   _____

24   [7] Plaintiffs' Code claims for missed breaks, overtime and for uniform-maintenance reimbursement, which are subject to a three-year limitations period, see Cal. Civ. Proc. Code § 338 (adopting a three-year statute for "action[s] upon a liability created by statute), are subsumed by the Business and Professions Code's longer, four-year statutory period, see Cal. Bus. & Prof. Code § 17208 (stating that "[a]ny action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued").  The one-to-three-year statutory period for Plaintiffs' wage-statement claim, see Garcia v. Bana, 2013 WL 621793 at *12–13 (N.D. Cal. filed Feb. 19, 2013) (explaining that claims under section 226 are subject to a one-year or three-year limitations period, depending on whether "actual" or "statutory" damages are sought), is shorter than the four-year period under the unfair-competition law.  Similarly,

1    Again, under the Settlement Agreement, ATS will pay $600,000 for the benefit of

2    these 2,842 members.  The $600,000 settlement amount constitutes the Gross Settlement

3    Payment.  (Harris Decl., Ex. 1 at ¶ 5.1.)  The Gross Settlement Payment will be used to

4    pay the costs of delivering the Class Notice and the claim form to the Settlement Class, as

5    well as to pay attorney's fees and costs to Class Counsel, incentive awards and individual

6    payments (on account of their execution of broad releases of claims and agreement not to

7    seek future employment) to Plaintiffs, and a PAGA payment to the LWDA, all subject to

8    approval by this Court.[8]  (Harris Decl., Ex. 1 at ¶¶ 5.1, 5.3, 5.4 and 5.5.)  The Gross

9    Settlement Payment also includes the value of Class Member security deposits held by

10    Defendant as of January 1, 2018 ($50,957.45) and accrued interest as of January 1, 2018.

11    (Harris Decl., Ex. 1 at ¶ 5.7.)

12    After the above-noted deductions have been made from the Gross Settlement

13    Payment, the balance (the "Net Settlement Fund") will be distributed to Settlement Class

14    members who do not "opt out" of the settlement and who submit valid and timely claim

15    forms.[9]  (Harris Decl., Ex. 1 at ¶ 5.8.)  This distribution will be made on a *pro rata* basis

16    according to the Class Member's length of active employment in the State of California

17    as a non-exempt employee since November 20, 2011, through the date of preliminary

18    approval, as reflected in ATS's payroll records.  Each Class Member's proportional share

19    shall be calculated by multiplying the balance of the Net Settlement Amount by a

20    fraction, the numerator of which is the total of the Class Member's number of workweeks

21    during the class period, and the denominator of which is the total of all workweeks for

22    _____

23    Plaintiffs' claim for continuing wages is no longer than four years.  See Code § 203(b)
(stating that "[s]uit may be filed for [continuing-wage] penalties at any time before the
expiration of the statute on an action for the wages from which the penalties arise").

24    [8] Class Counsel will request an award of attorney's fees of up to 33% of the Gross
Settlement Payment, an award of costs not to exceed $12,000, incentive payments to

25    Plaintiffs of $500 each and individual payments to Plaintiffs of $4,500 each.  (Harris
Decl., Ex. 1 at ¶¶ 5.3 and 5.4.)  The reasonableness of these amounts is discussed *infra* in

26    section III.D. of this Memorandum.  As for claims-administration fees and expenses,
Class Counsel presently anticipate that such fees and costs will not exceed $27,000.

27    (Harris Decl. ¶7.)  Once a settlement administrator has been mutually agreed to by the
Parties, Plaintiffs will update the Court in a supplemental filing.

28    [9] Settlement Class members who do not opt out as described *infra* in section III.F. of this
Memorandum are referred to as "Class Members."  (Harris Decl., Ex. 1 at ¶ 1.23.)

Class Members who have submitted valid and timely claim forms.  (Harris Decl., Ex. 1 at ¶ 5.8.1.)  Accordingly, the longer a participating Class Member worked for ATS, the greater his or her share.  Each Class Member's Individual Settlement Payment shall be characterized as 80% 1099 income and 20% W-2 income.  (Harris Decl., Ex. 1 at ¶ 5.8.3.) As part of the Settlement, ATS shall distribute all deposit sums, which include accrued interest, to Class Members on whose behalf the security deposits were held. (Harris Decl., Ex. 1 at ¶ 5.7.)  According to ATS's records, the 2,842 Settlement Class members worked a total of approximately 127,808 weeks during the class period.  (Harris Decl. ¶ 14.)

### B.    The Estimated Recovery To Class Members

The sum of potential damages on account of unpaid premium wages for failing to provide proper meal breaks ($37,773) and unpaid overtime ($72,500) is about $110,000. In addition, the Settlement Agreement provides for the return of 100% of the balance of Deposit Sums still retained by ATS, just over $50,000.  The balance of the payments represent attorney's fees and costs as well as a sum attributable to penalties, civil penalties and liquidated damages, recoveries which courts routinely permit to be substantially discounted in cases in which unpaid wage claims are paid, as here.

Assuming that the Court approves $200,000 in attorney's fees (equal to 33.33% of the Gross Settlement Payment), a maximum of $12,000 in litigation expenses, a maximum of $27,000 in claims-administration expenses, $500 incentive awards to each Plaintiff, $4,500 individual payments to the Plaintiffs on account of their broad general release of claims, including individual claims for retaliation and discrimination, and their agreement not to seek employment with Defendant, and $7.500 for payment to the LWDA, $338,500 will remain.  Out of the $338.500, $50,956.45 is the Deposit Sum held by ATS which will be distributed to Class Members on whose behalf the security deposits are being held.  The remaining Net Settlement Amount is $287,544.  Assuming a 100% participation rate, the average net payment to Class Members will therefore be some $101.18 (= $287,544 ÷ 2,842 Class Members).

Of course, "[h]uman nature dictates that[,] despite counsel's best efforts, not all [Settlement C]lass members will submit claims." <u>Kakani v. Oracle Corp.</u>, 2007 WL 2221073 at *4 (N.D. Cal. filed Aug. 2, 2007).  Accordingly, it is more reasonable to assume a participation rate by the Settlement Class between 25% and 50%.  See <u>e.g.</u>, <u>Smith v. CRST Van Expedited, Inc.</u>, 2013 WL 163293 at *4 (S.D. Cal. filed Jan. 14, 2013) (in approving a settled wage-and-hour class action, noting that 44% of the class had submitted claims, which the court characterized as a "positive" response); <u>Vasquez v. Coast Valley Roofing, Inc.</u>, 266 F.R.D. 482, 485 (E.D. Cal. 2010) (in approving a settled wage-and-hour class action, noting that "31% of the class submitted claims"); <u>Sandoval v. Tharaldson Employee Mgmt., Inc.</u>, 2010 WL 2486346 at *7 (C.D. Cal. filed June 15, 2010) (in approving a settled wage-and-hour class action, noting that "24% of [c]lass [m]embers submitted valid claim[s]," which the court characterized as a "positive" response).  If 50% of the Settlement Class submit claims, the average net settlement payment doubles to $202.35 (= $287,544 ÷ 1421 Class Members); if 25% of the Settlement Class submit claims, the average net settlement payment increases to $404.42 (= $287.544 ÷ 711 Class Members).

All uncashed or undeliverable settlement checks will expire after 180 days. The sum value of all expired checks will be tallied by the Settlement Administrator. As to all uncashed settlement payments, the Settlement Administrator will direct the funds to the Industrial Relations Unpaid Wage Fund described in Code section 96.6 or as consistent with applicable law and approved by the Court. (Harris Decl., Ex. 1 at ¶ 5.8.4.)  ATS is therefore not entitled to a reversion of any amounts in the Net Settlement Fund.  (Harris Decl., Ex. 1 at ¶ 5.8.4.)

## C.    Additional Non-Monetary Relief

Aside from the above-described cash fund, as a direct result of this lawsuit ATS has changes its security deposit practices . Specifically. ATS stopped taking deposits in August 2017 and no longer requires security deposits at all.  (Harris Decl. ¶ 13.)  This is a noteworthy benefit from this lawsuit, given that Plaintiffs are former employees who

necessarily would not have been able to obtain such relief even if they had prevailed at trial. See, e.g., Helm v. Alderwoods Group, Inc., 2011 WL 5573837 at *1, 5 (N.D. Cal. filed Nov. 15, 2011) (in a wage-and-hour action alleging Code violations, holding that "[a] former employee does not have standing o seek injunctive relief for any of the violations of his former employer because he cannot demonstrate  a 'real or immediate threat of irreparable injury'").  Because "this concession from [ATS] exceeds what Plaintiff[] could have obtained even if [she] had prevailed at trial," it has value separate and apart from the cash fund described above.  Wren v. RGIS Inventory Specialists, 2011 WL 1230826 at *28 (N.D. Cal. filed Apr. 1, 2011).

## D.    Incentive Awards and Attorney's Fees

Under the terms of the Settlement Agreement, Class Counsel will apply for an incentive award to Plaintiffs of $500 each for their efforts in bringing and prosecuting this case.  (Harris Decl. ,Ex. 1 at ¶¶ 5.2 and 5.4.)  Granting the requested incentive award will *still* result in the settlement amounts detailed above.

According to the Ninth Circuit, "[i]ncentive awards are fairly typical in class action cases" and "are intended to compensate class representatives for work done on behalf of [a] class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general." Rodriguez v. West Publ'g Corp., 563 F.3d 948, 958–59 (9th Cir. 2009) (emphasis removed), vacated on other grounds, 688 F.3d 645, 660 (9th Cir. 2012).  As recently explained by the Southern District of California, courts should consider "'the risk to the class representative in commencing suit, both financial and otherwise,'" as well as "'the amount of time and effort spent by the class representative'" and "'the personal benefit (or lack thereof) enjoyed by the class as a result of the litigation.'"  Smith, 2013 WL 163293 at *6 (quoting Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995)).

Here, all of the factors weigh in favor of approving the award.  First, as a direct result of Plaintiffs' having brought this suit, participating Class Members will receive a

cash benefit in recognition of the claims alleged in this case, most of which are penalties. Second, Plaintiffs have expended considerable time conferring with Class Counsel and their investigators, providing factual background and support, analyzing ATS's provided data, and participating in mediation and subsequent settlement discussions. (Harris Decl., Exs. 3, 4, and 5 (March 9, 2018 Declarations of Gideon Pederson, Sasha Mason and Ruth Alcaraz in Supp. of Mot. for Preliminary Approval of Class-Action Settlement & Conditional Certification of Settlement Class.)) Third, Plaintiffs "undertook the financial risk that, in the event of a judgment in favor of [ATS] in this action, [they] could have been personally responsible for any costs awarded in favor of [ATS]." Vasquez, 266 F.R.D. at 491. Indeed, incentive awards are particularly appropriate in the context of employment class actions, where they help to alleviate the "stigma upon future employment opportunities for having initiated an action against a former employer." Campbell v. First Investors Corp., 2012 WL 5373423 at *8 (S.D. Cal. filed Oct. 29, 2012). Because the requested incentive payments are well *below* the range awarded in similar cases, see Smith, 2013 WL 163293 at *6 (noting that incentive awards range from $25,000 to $50,000), they should be approved.

ATS has agreed not to oppose Class Counsel's incentive-award application. (Harris Decl., Ex. 1 at ¶ 5.4.) ATS has also agreed not to oppose Class Counsel's application for an award of attorney's fees and reimbursement of litigation expenses. (Harris Decl., Ex. 1 at ¶ 5.3.) Pursuant to the terms of the Settlement Agreement, Class Counsel intend to apply for an award of attorney's fees in an amount not to exceed 33.33% of the Gross Settlement Payment, *i.e.*, $200,000, as well as an award of costs not to exceed $12,000. (Harris Decl., Ex. 1 at ¶ 5.3.) Principles of equity permit fees and costs to come from the fund as a whole. See, e.g., Boeing Co. v. Van Germet, 444 U.S. 472, 478 (1980) (explaining that the "common-fund" doctrine "allows a court to . . . assess[] attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.").

1       Although the requested 33.33% exceeds the 25% "benchmark" for common-fund

2   cases, see, e.g., Vasquez, 266 F.R.D. at 491 (stating that "[t]he typical range of

3   acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement

4   value, with 25% considered the benchmark"), it is warranted in this case on account of (i)

5   the fact that participating Class Members will likely receive 100% of their outstanding

6   meal-period compensation even if the requested fee is awarded—an outstanding result,

7   given the potentially dispositive defenses to Plaintiffs' claims, discussed *infra* in section

8   IV.B.ii.a. of this Memorandum—and (ii) the fact that Class Counsel's lodestar is

9   significantly more than $200,000.  See Singer v. Becton Dickinson & Co., 2010 WL

10  2196104 at *8–9 (S.D. Cal. filed June 1, 2010) (departing from the benchmark and

11  awarding fees equal to 33.33% of the settlement fund when class members would recover

12  "110% of their claimed losses"); Hopkins v. Stryker Sales Corp., 2013 WL 496358 at *3

13  (N.D. Cal. filed Feb. 6, 2013) (explaining that courts depart from the benchmark when

14  the requested fees are "significantly less than the lodestar").  According to the Central

15  District, when compared to other settlements of comparable size, the 33.33% request is

16  reasonable.  See, e.g., Craft v. County of San Bernardino, 624 F. Supp. 2d 1113, 1125

17  (C.D. Cal. 2008) (explaining that "25% is substantially below the average class fund fee

18  nationally" and that "[c]ases of under $10 [m]illion will often result in fees above 25%");

19  Cicero v. DirecTV, Inc., 2010 WL 2991486 at *6 (C.D. Cal. filed July 27, 2010)

20  (explaining that "case law surveys suggest that . . . 30–50% [is] commonly awarded in

21  case[s] in which the common fund is relatively small").  In any event, the Settlement

22  Class will be given an opportunity to object to Class Counsel's requested fees, and the

23  Court will have an opportunity to address the fee award after Class Counsel have filed the

24  necessary motion.

25      **E.    Notice to the Class**

26      Plaintiffs have sought bids for settlement administration from reputatable claims

27  administration companies and will request that the Court appoint a settlement

28  administrator before the hearing on preliminary approval to deliver the Class Notice and

the claim form to Settlement Class members.  As noted above, the expenses associated with claims administration will be come from the Gross Settlement Payment.  (Harris Decl., Ex. 1 at ¶ 1.15.)  This is appropriate.  <u>Staton v. Boeing Co.</u>, 327 F.3d 938, 975 (9th Cir. 2003) (stating that "[t]he post-settlement cost of providing notice to the class can reasonably be considered a benefit to the class").  (Harris Decl. ¶ 7.)

The Class Notice to be delivered to Settlement Class members includes the information required by Rule 23 of the Federal Rules of Civil Procedure.  Specifically, the Class Notice describes the nature of the action, the definition of the Settlement Class, and the class-wide claims; it explains that Settlement Class members may enter an appearance through an attorney and that the Court will exclude those members requesting exclusion; and it specifies the time requirements and manner of requesting exclusion, as well as the binding effect of a class-wide judgment.  (<u>Compare</u> Harris Decl. Ex. 2 at pp. 1–4 <u>with</u> Fed. R. Civ. Proc. 23(c)(2)(B) (stating that "[t]he notice must clearly and concisely state in plain, easily understood language:  (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims, issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the member so desires; (v) that the court will exclude from the class any member who requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on members under Rule 23(c)(3).").)  Although Rule 23 does not require that notices inform class members of their objection rights, <u>see</u> <u>Int'l Union v. Gen. Motors Corp.</u>, 497 F.3d 615, 630 (6th Cir. 2007), the Class Notice herein explains that Settlement Class members may object (Harris Decl., Ex. 2 at pp. 3–4).  Furthermore, (i) the Class Notice indicates the time and place of the hearing to consider final approval of the settlement, (ii) it prominently displays the address and telephone number of Class Counsel and the procedure for making inquiries, and (iii) it provides information regarding attorney's fees and the incentive award.  (Harris Decl.,Ex. 2 at p. 3.)  <u>See</u> William W Schwarzer, *et al.*, <u>California Practice Guide:  Federal Civil Procedure Before Trial</u> ¶ 10:824 (The Rutter Group 2012) (specifying the content of settlement notice).  In addition, the Class Notice

explains the procedures for allocating and distributing the Net Settlement Fund to participating Class Members.  (Harris Decl., Ex. 2 at p. 2.)

Under the Settlement Agreement, the Claims Administrator will deliver the Class Notice and claim form to Settlement Class members via first-class mail within fourteen days of receiving address information from ATS.[10]  (Harris Decl., Ex. 1 at ¶ 3.2 and 3.3.) Settlement Class members will have forty-five days from the date of mailing to submit completed claim forms or exclusion requests to the Claims Administrator.  (Harris Decl., Ex. 1 at ¶ 4.2.)  Settlement Class members will also have forty-five days from the date of mailing to file objections.  (Harris Decl., Ex. 1 at ¶¶ 4.1 and 4.5.)

## F.    Release Provisions and Opting Out

If the Court grants final approval of the settlement, then, in exchange for the consideration described above, Class Members will be deemed to have released ATS from those claims that were or could have been asserted in the Complaint stemming from the specific facts alleged therein.  (Harris Decl., Ex. 1 at ¶ 3.2.)  If a Settlement Class member opts out pursuant to the procedures outlined in the Class Notice, then he or she will not release any claims that he or she may have against ATS.  (Harris Decl., Ex. 1 at ¶ 1.23 (defining "Class Members" as only those individuals "who do not exclude themselves"), ¶ 4.4 (stating that those Settlement Class Members who opt out of the settlement "shall not be bound by the release provisions in this Agreement or the applicable release provisions in any order granting final approval of class action settlement.")

## IV.    The Court Should Conditionally Certify the Settlement Class and Should Preliminarily Approve the Settlement Agreement

### A.    Class Certification Is Warranted

There is authority to the effect that a pre-certification settlement is subject to a somewhat higher level of scrutiny than one negotiated post-certification.  See, e.g.,

---

[10] ATS will provide the Claims Administrator with a list of the last-known names, addresses, and social-security numbers of Settlement Class members within fourteen days of preliminary approval.  (Harris Decl. ¶ 1 & Ex. 1 at ¶ 3.3.)

1    Dunleavy v. Nadler, 213 F.3d 454, 458 (9th Cir. 2000).  However, concerns about the

2    rights of absent Settlement Class members can be dispelled by the Court's review of the

3    Settlement Agreement and by the procedural protections provided by Rule 23.  Officers

4    for Justice v. Civil Serv. Comm., 688 F.2d 615, 624–25 (9th Cir. 1982), cert. denied, 459

5    U.S. 1217 (1983).  A trial court has wide discretion in certifying a class for settlement

6    purposes and will be reversed "'only upon a strong showing that [its] decision was a clear

7    abuse of discretion.'"  Dunleavy, 213 F.3d at 461 (quoting Linney v. Cellular Alaska

8    P'ship, 151 F.3d 1234, 1238 (9th Cir. 1998)).

9         Class actions are favored, and Rule 23 is to be given a broad, rather than a

10   restrictive, interpretation in favor of maintaining class actions.  Adames v. Mitsubishi

11   Bank, Ltd., 133 F.R.D. 82, 88 (E.D.N.Y. 1989); Labbate-D'Alauro v. GC Servs. Ltd.

12   P'ship, 168 F.R.D. 451, 454 (E.D.N.Y. 1996).  Rule 23 contains four certification

13   requirements:  (i) The class must be so numerous "that joinder of all members is

14   impracticable," (ii) there must be "questions of law or fact common to the class," (iii) the

15   claims of the representative plaintiffs must be "typical of the claims of the class," and (iv)

16   the class representative must show that he or she "will fairly and adequately protect the

17   interests of the class."  Fed. R. Civ. Proc. 23(a).  Here, the numerosity requirement is met.

18   Again, the total number of Settlement Class members is over 2,800.

19        Likewise, the commonality requirement is met.  In this regard, a plaintiff is *not*

20   required to show that there is commonality on *every* factual and legal issue; instead, "for

21   purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do."  Wal-Mart

22   Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2556 (2011) (brackets in original) (quoting

23   Richard A. Nagareta, The Preexistence Principle and the Structure of the Class Action,

24   103 Colum. L. Rev. 149, 176 n.110 (2003)).  See also Negrete v. Allianz Life Ins. Co. of

25   N. Am., 287 F.R.D. 590, 601–02 (C.D. Cal. 2012) (explaining that, "[e]ven after Dukes,

26   the commonality inquiry does not require plaintiffs to demonstrate the 'predominance' of

27   common issues over individualized ones, nor the 'cohesion' of the class").  With respect

28   to the present matter, there is considerable commonality among Settlement Class

members, as ATS never paid meal-period wages for workdays when "NO LUNCH" was coded on their time sheets.  Whether that policy is legal or illegal can be determined on a class-wide basis only once rather than 2,842 separate times in individual suits brought by each Settlement Class member.  See Amgen, Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1191 (2013) (explaining that class certification "requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class") (emphasis in original).  The same goes for whether ATS was required to reimburse employees for maintaining their uniforms, as well as for whether ATS's wage statements complied with Code § 226(a) and whether ATS's deduction policy complied with Code § 221.  These issues, in fact, predominate over issues that affect only individual Settlement Class members (for example, the individual meal-period damages owing to each Settlement Class member).  Moreover, even if it should turn out that the Class definition includes individuals who have not been injured or who do not wish to pursue claims, that is not a bar to certification.  See Elliott v. ITT Corp., 150 F.R.D. 569, 575 (N.D. Ill. 1992).  Cf. Joseph v. Gen. Motors Corp., 109 F.R.D. 635, 639–40 (D.C. Colo. 1986).

Plaintiffs also meet the typicality requirement, and they are adequate class representatives.  The fact-pattern for Plaintiffs is similar, if not identical, to the fact-pattern for other Settlement Class members:  Plaintiffs and Settlement Class members earned hourly wages but were not provided meal-period compensation for documented cancelled meals, and they were required to shoulder the expense of maintaining their uniforms.  Plaintiffs also have no conflicts of interest with Settlement Class members, as they share their likely desire to be paid in full.  (See Harris Decl., Exs. 3-5 (Pederson Decl. ¶ 6; Mason Decl., ¶ 6; Alcaraz Decl., ¶ 6.))  Additionally, Plaintiffs are committed to pursuing the claims of the Settlement Class, and their motivation in retaining counsel and pursuing this action has been to seek reimbursement for themselves and Settlement Class members, as well as to ensure that ATS complies with wage-and-hour requirements.  (See Harris Decl., Exs. 3-5.)

In addition to the above-described four requirements, this case must also meet one of the non-exclusive factors in Rule 23(b).  Rule 23(b) authorizes class certification if a court determines that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. Proc. 23(b)(3).  As noted with respect to the commonality requirement, the central issue in this case is the legality of ATS's meal-period, wage statement, uniform-maintenance and deduction policies.  The only individual determinations, then, are the quantification of damages for each Settlement Class member—and such individual determinations do not defeat class certification.  See Yokoyama v. Midland Nat'l Life Ins. Co., 594 F.3d 1087, 1089 (9th Cir. 2010) (stating that "[t]he potential existence of individualized damage assessments, however, does not detract from the action's suitability for class certification," and explaining "that '[t]he amount of damages is invariably an individual question and does not defeat class action treatment'").

### B.    The Settlement Meets the Requirements for Preliminary Approval

If a proposed settlement appears to be the product of "'serious, informed, non-collusive negotiations,'" and if it "has no obvious deficiencies," the court "should direct that notice be given to the class of a formal fairness hearing.'"  Young v. Polo Retail, Inc., 2006 WL 3050861 at *5 (N.D. Cal. Oct. 25, 2006) (quoting Manual for Complex Litigation (Second) § 30.44 (1985)).  The Settlement Agreement satisfies these requirements.

### i.    Settlement Negotiations Were Conducted at Arm's Length

There is no doubt that the Settlement Agreement was reached through arm's length bargaining.  Again, the parties participated in private mediation before an experienced wage-and-hour mediator familiar with the airline industry.  (Harris Decl., ¶ 4.)  During the mediation and in subsequent settlement negotiations, Class Counsel gave serious consideration to ATS's potentially dispositive affirmative defenses, discussed *infra* in

section IV.B.ii.a. of this Memorandum.  Moreover, in advance of the mediation, ATS's counsel provided Class Counsel with information as to the size of the Settlement Class, as well as to the total number of cancelled meal breaks during the class period.  (Harris Decl. ¶ 7.)  Class Counsel were thus able to calculate potential damages with precision. Ultimately, the parties agreed upon a Gross Settlement Payment of $600,000—an amount that will likely provide participating Class Members with a substantial portion of their outstanding meal-period compensation, as well as additional amounts for Plaintiffs' other claims.  ATS has also changed its deduction practices as a result of this lawsuit, which is significant non-monetary relief for class members to remedy the alleged deduction violations on a going-forward basis.

### ii.    The Settlement Has No Obvious Deficiencies

According to the Ninth Circuit:

> "Assessing a settlement proposal requires a district court to balance a number of factors:  the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining a class-action status throughout the trial; the amount offered in the settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; . . . and the reaction of the class members to the proposed settlement."

Dunleavy, 213 F.3d at 458 (quoting Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)) (ellipses in original).  Certain factors may predominate in different factual contexts, and one factor alone may predominate over all the others and provide sufficient grounds for approval of a settlement.  See Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993).

### a.    The Strength of Plaintiffs' Case

Since the inception of this case, ATS has asserted that Plaintiff's meal-break claims are preempted under the Airline Deregulation Act ("ADA"), 49 U.S.C. § 41713. The Northern District of California has held that, because "ADA preemption applies to

'state enforcement actions having a connection with, or reference to[,] carrier rates, routes or services . . . even if a state law's effect on rates, routes or services is only indirect,'" and because "enforcing state meal period . . . regulations would impermissibly regulate an air carrier's service" by, say, "prevent[ing] an aircraft from being fueled or serviced" or by preventing "cargo from being unloaded such that [there] would [be an] impact [on] the schedule of the point-to-point transportation of passengers or cargo," California's meal-break statute is preempted. <u>Angeles v. US Airways, Inc.</u>, 2013 WL 622032 at *8–9 (N.D. Cal. filed Feb. 19, 2013) (quoting <u>Rowe v. N.H. Motor Transp. Ass'n</u>, 552 U.S. 364, 370 (2008)) (quotation marks omitted). <u>See also</u> <u>Blackwell v. Skywest Airlines, Inc.</u>, 2008 WL 5103195 at *15–18 (S.D. Cal. filed Dec. 3, 2008) (holding that California's meal-period requirements are preempted under the ADA because they impact an airline's services, routes, and prices). If preemption applies, *none* of the Settlement Class are entitled to *any* meal-period damages.[11] The $600,000 Gross Settlement Payment, which will likely provide participating Class Members with a substantial amount of what they are owed for missed breaks, is therefore more than reasonable. This factor thus weighs in favor of approving the settlement. (Harris Decl., ¶ 15.)

Another potentially dispositive defense applies to Plaintiff's claim for improper wage statements. Plaintiffs' wage statement claim is based on the assertion that ATS is a "temporary services employer." Defendant has argued that ATS does not meet the definition of a temporary services employer because it does not provide workers to its customers, but rather services. If Defendant were to prevail on this argument, Class Members would not be entitled to any damages for the wage statement claim. (Harris Decl., ¶ 16.)

With respect to Plaintiffs' expense reimbursement claim for uniform maintenance, Defendant has denied that ATS issued any directive requiring employees to dry clean their uniforms and has raised the defense that individualized inquiries would preclude

---

[11] Preemption, in other words, is a common issue further justifying class certification.

1  class action treatment of this claim. (Harris Decl., ¶ 17.)

2      With respect to Plaintiffs' unlawful deduction claim, Defendant has argued that

3  there is no private right of action for a Code § 221 claim and is therefore subject to a one

4  year statute of limitations under PAGA.  Defendant also argues that therefore the

5  Plaintiffs lack standing to bring this claim.  (Harris Decl., ¶ 18.)

6      Defendant also disputes the merits of any regular rate based overtime claim or

7  overtime claim based on Defendant's failure to comply with the requirements for

8  alternative workweek elections.  (Harris Decl., ¶ 19.)

9      The defenses raised by ATS potentially eliminate *any* liability for Plaintiffs' meal

10  period, pay-stub, expense reimbursement, unlawful deduction, overtime and derivative

11  continuing-wage claims.  Given these defenses, the $600,000 Gross Settlement Payment,

12  which will provide participating Class Members with an average net payment of at least

13  $101.18, should be approved.

14                    **b.      The Likely Duration of Further Litigation**

15      In most cases, "'unless the settlement is clearly inadequate, its acceptance and

16  approval are preferable to lengthy and expensive litigation with uncertain results.'"  Nat'l

17  Rural Telcomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 526 (C.D. Cal. 2004)

18  (quoting 4 Alba Conte & Herbert Newberg, Newberg on Class Actions § 11:50 (4th ed.

19  2002)).  Because the putative Settlement Class has not yet been certified and because

20  notice has not been sent out, the likely duration of further litigation might well be several

21  years.  Accordingly, this factor also weighs in favor of approving the settlement.

22                    **c.      The Risk of Maintaining Class-Action Status Through Trial**

23      Of course, "there is no guarantee that [a d]efendant w[ill] not move for and obtain

24  decertification of [a c]lass before or during trial."  Rodriguez v. West Publ'g Corp., 2007

25  WL 2827379 at *8 (C.D. Cal. filed Sept. 10, 2007) (citing In re NASDAQ Market-

26  Makers Antitrust Litig., 187 F.R.D. 465, 476 (S.D.N.Y. 1998)), rev'd on other grounds,

27  563 F.3d 948 (9th Cir. 2009).  See also Rodriguez, 2007 WL 2827379 at *8 (stating that,

28  "if 'insurmountable management problems were to develop at any point, class

certification can be revisited at any time under Fed. R. Civ. P. 23(c)(1)'") (quoting In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. at 476).  With respect to meal-break claims in particular, the California Supreme Court has held that "[a]n employer's duty . . . under . . . section 512 . . . is an obligation to provide a meal period," which is satisfied if the employer "relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted 30-minute break."  Brinker Rest. Corp. v. Superior Court, 53 Cal. 4th 1004, 1040 (2012).  This means that an employer is not liable for meal-break violations if the employee voluntarily foregoes a break.  As explained by the Central District of California, there is often "no way of determining on a classwide basis whether [missed breaks] were violations . . . or whether individual class members voluntarily opted to start their meal break late, cut it short, or not take a break at all."  Ordonez v. Radio Shack, Inc., 2013 WL 210223 at *7 (C.D. Cal. filed Jan. 17, 2013).  There is thus a risk that Plaintiffs' claims may be decertified before trial, and this factor weighs in favor of approval.

### d.    The Settlement Amount Offered

The Gross Settlement Payment of $600,000 will result in an average net payment of $101.18.  In addition, those employees who have had deductions taken from their wages will be reimbursed for those amounts.  This represents a more-than-reasonable resolution of this case.  See Rodriguez, 2007 WL 2827379 at *9 (noting that a "'settlement amount representing 33% of the maximum possible recovery was well within a reasonable range when compared with recovery percentages in other class action settlements'") (quoting In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 257–58 (D. Del. 2002).  Consequently, this factor weighs in favor of approving the settlement.

### e.    The Extent of Discovery and Stage of the Proceedings

Given the parties' attempts at an early resolution of this case, Plaintiffs have not had occasion to undertake any "formal" discovery.  However, as explained by the Ninth Circuit, "'in the context of class action settlements, "formal discovery is not a necessary ticket to the bargaining table" where the parties have sufficient information to make an

informed decision about settlement.'" <u>Dunleavy</u>, 213 F.3d at 459 (quoting <u>Linney</u>, 151 F.3d at 1239).  Here, in negotiating the Settlement Agreement, Class Counsel were provided with information as to the size of the Settlement Class, as well as to the total number of cancelled breaks during the class period.  Class Counsel were also provided information regarding the security deposits maintained by Defendant and the alternative workweek elections held by Defendant.  (Harris Decl. ¶¶ 7-11.)  In addition, Class Counsel undertook their own independent investigation to inform their negotiating position, including risk re-evaluation in light of the potentially dispositive defenses noted above.  (<u>See</u> Harris Decl. ¶¶ 3, 8.)  All told, they had sufficient information to make an informed decision about settlement.  This factor thus weighs in favor of approval.

### f.    The Experience and Views of Counsel

As reflected in the Declarations of Alan Harris and John P. Dorigan filed herewith, Class Counsel have substantial experience in prosecuting class actions, including wage-and-hour actions.  (<u>See</u> Harris Decl. ¶¶ 20-21; Dorigan Decl., ¶¶ 1-4.)  Class Counsel are of the opinion that the Settlement Agreement represents an excellent bargain for the Settlement Class, given the inherent risks, hazards, and expenses of carrying the case through trial.  (Harris Decl. ¶ 22 ; Dorigan Decl. ¶¶ 5-7.)  As the Central District has explained, this weighs strongly in favor of approving the settlement.  <u>See</u> <u>Rodriguez</u>, 2007 WL 2827379 at *9 (explaining that "the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties").

### g.    The Reaction of Class Members to the Proposed Settlement

The reaction of Class Members to the Settlement Agreement cannot, of course, be known until preliminary approval is given, Class Notice is delivered, and responses are received.  This factor is therefore neutral at the preliminary-approval stage.

//

//

//

//

**V.     Conclusion**

Under the Settlement Agreement, assuming a one hundred percent participation rate, Class Members will receive on average $101.  This represents a significant portion of the damages sought by Plaintiffs' lawsuit.  Employees who suffered deductions from their wages will also have these funds returned.  The Court therefore should grant conditional certification of the Settlement Class and should preliminarily approve the settlement.


Dated:  March 9, 2018                                    Respectfully submitted,

                                                         HARRIS & RUBLE
                                                         LAW OFFICES OF JOHN P.
                                                         DORIGAN


                                                              /s/ *Alan Harris*
                                                         Alan Harris
                                                         John P. Dorigan

PLS.' NOT. OF MOT. AND MOT. FOR PRELIMINARY APPROVAL; MEM. OF P. & A. IN SUPP. THEREOF