# United States District Court
# Central District of California

JS-6



FILED
CLERK, U.S. DISTRICT COURT

AUG 03, 2018

CENTRAL DISTRICT OF CALIFORNIA
BY:    BH    DEPUTY

G. Pederson, et al.,

Plaintiffs,

v.

Airport Terminal Services,

Defendant.

ED 15-cv- 02400-VAP (SPx)

**Order (1) GRANTING Plaintiffs' Motion for Final Approval of Class Action Settlement, (Doc. No. 48), and (2) GRANTING in part and DENYING in part Plaintiffs' Motion for Attorney's Fees, Incentive Awards, and Reimbursement of Costs, (Doc. No. 47)**

On May 7, 2018, Plaintiffs Gideon Pederson, Ruth Alcaraz, and Sasha Mason ("Lead Plaintiffs"), individually and on behalf of the Settlement Class (collectively, "Plaintiffs"), filed a Motion for Award of Attorneys' Fees, Incentive Awards, and Reimbursement of Costs.  (Doc. No. 47 ("Fees Motion").)  On June 4, 2018, Plaintiffs filed a Motion for Final Approval of Class Action Settlement.  (Doc. No. 48 ("Motion").)  Defendant Airport Terminal Services ("ATS" or "Defendant") does not oppose either motion.

After consideration of the papers filed in support of the motions, as well as oral arguments advanced at the July 2, 2018 hearing, the Court GRANTS Plaintiffs' Motion for Final Approval of Class Action Settlement and GRANTS in part and DENIES in part Plaintiffs' Motion for Award of Attorneys' Fees, Incentive Awards, and Reimbursement of Costs.

# I.    BACKGROUND

## A. Factual and Procedural Background

Plaintiffs are current and former employees of Defendant who worked as
Airport Agents in Riverside County.  (Doc. No. 18 ("SAC") ¶¶ 1-2.)  Plaintiffs allege
Defendant violated various provisions of the California Labor Code, the California
Code of Regulations, and the California Business and Professions Code by
(1) failing to pay earned wages to Airport Agents on account of late, curtailed, or
missed meal periods; (2) failing to provide Airport Agents with proper wage
statements; (3) failing to reimburse Airport Agents for uniform maintenance
expenses; (4) collecting unlawful deductions from employees; (5) unlawfully
requiring Airport Agents to purchase uniforms; (6) failing to pay the correct amount
of overtime owed to Airport Agents; (7) failing to provide Airport Agents with proper
seating; and (8) engaging in unfair, unlawful, and/or fraudulent business practices
in violation of California law.  (Id. ¶¶ 3-4.)

On November 20, 2015, Plaintiffs filed a putative class action complaint
against Defendant in this Court.  (Doc. No. 1.)  On January 25, 2016, Plaintiffs
filed a first amended complaint to clarify their California Labor Code Private
Attorneys General Act of 2004 ("PAGA") claims.  (Doc. No. 11.)  Plaintiffs then filed
the operative Second Amended Complaint on April 14, 2016.  (SAC.)  On April 5,
2018, the Court preliminarily approved the settlement agreement and conditionally
certified the class for settlement.  (Doc. No. 41 ("Prelim. Appr. Order").)

The claims in this case overlap substantially with a prior class action lawsuit,
Collette McDonald v. Airport Terminal Serv., No. CV-11-01946-VAP (SPx) (C.D.
Cal. 2011).  The investigation similarly overlapped.  (Doc. No. 48-2 ("Harris Decl.")

¶ 3.)  After a mediation on August 9, 2016, and further negotiations with the
assistance of the mediator, the parties filed a Notice of Settlement on January 4,
2018, before any motion practice occurred.  (Doc. No. 35.)  By March 2018, the
parties concluded their negotiations and executed the Settlement Agreement.
(Doc. No. 48-2, Ex. 1 ("Settlement Agreement").)

### B. Settlement Agreement

This Settlement Agreement provides for the settlement of all pending claims
against Defendant in this case.  (Settlement Agreement ¶¶ 2.7, 2.10.)  It defines
the proposed class ("Class Members") as: "any current or former non-exempt
employee who is or was employed by Defendant within California at any time from
November 20, 2011, through the date of preliminary approval of the settlement."
(Id. ¶ 1.5)  According to Defendant's records, there are 2,941 Settlement Class
Members.  (Harris Decl. ¶ 14.)

The Settlement Agreement includes the following terms:

### 1. Monetary Relief to Class Members

The Settlement Agreement provides for a Gross Settlement Amount ("GSA")
of $600,000.  (Settlement Agreement at ¶ 5.1.)  This amount includes all attorneys'
fees and costs, class representative incentive awards, plaintiffs' individual
payments, the State of California's Labor and Workforce Development Agency
("LWDA") payment, settlement administration costs, individual settlement
payments, and all employee or employer payroll taxes.  (Id.)  The GSA also
includes the Deposit Sum, which is the security deposits and accrued interest paid
by Class Members and held by Defendant as of January 1, 2018, currently
calculated to be $50,956.45.  (Id. ¶ 1.12; Mot. at 2.)

3

After these deductions from the Gross Settlement Amount, the Net Settlement Amount ("NSA") will then be used to fund individual payments to class members.  (Id. ¶¶ 1.14, 1.17.)  Class Members must submit a claim form in order to receive an individual distribution.  The Settlement Agreement proposes two calculations to determine the individual distribution, the Claim-Made Calculation and the Alternative Calculation.  (Id. ¶¶ 5.8.1, 5.8.2.)  Under the Claim-Made Calculation, each Class Member's proportional share will be determined by multiplying the balance of the NSA by a fraction, the numerator of which is the total of the Class Member's number of workweeks during the class period, and the denominator of which is the total of all workweeks for Class Members who have submitted valid and timely claim forms.  (Id. ¶ 5.8.1.)  Under the Alternative Calculation, each Class Member's proportional share will be determined by multiplying the balance of the NSA by a fraction, the numerator of which is the total of the Class Member's number of workweeks during the class period, and the denominator of which is the total of all Class Members' workweeks during the class period.  (Id. ¶ 5.8.2.)  Each payment will be characterized as 80% 1099 income and 20% W-2 income.  (Id. ¶ 5.8.3.)

None of the GSA will revert to Defendant.  (Id. ¶ 5.8.4.)  All uncashed or undeliverable settlement checks will expire after 180 days.  (Id.)  The value of all expired checks will be tallied by the Settlement Administrator and paid to the Industrial Relations Unpaid Wage Fund described in California Labor Code section 96.6 or as consistent with applicable law and approved by the Court.  (Id.)

## 2.  Release of Claims Against Defendant

On the date the Court enters the final judgment and final approval, the Class Members will release each Released Party of and from all claims that were or

could have been based on or arise out of the facts or allegations alleged in
connection with this action.  (Id. ¶ 6.2.)   The Settlement Agreement defines
"Released Party" as "Defendant or any of its current or former subsidiaries,
affiliates, parents, predecessors, insurers, agents, employees, successors,
assigns, officers, officials, directors, employers, attorneys, personal
representatives, executors, and shareholders, including their respective pension,
profit sharing, savings, health, and other employee benefit plans of any nature, the
successors of such plans, and those plans' respective current or former trustees
and administrators, agents, employees, and fiduciaries."  (Id. ¶1.20)

### 3. Class Counsel's Fees and Costs

Defendant agreed not to oppose Plaintiffs' counsel's request for attorneys'
fees in an amount not to exceed 33% of the GSA – not more than $200,000 – and
not more than $12,000 for all attorneys' costs.  (Id. ¶ 5.3.)  The Court's approval of
Attorneys' Fees and Costs is not a material term of the Agreement, and any
different amount shall be allocated to the NSA or from the GSA.  (Id. ¶ 5.3.1.)

### 4. Class Representative Payments

In addition to their settlement share, Plaintiffs will apply to the Court for an
award of (i) Class Representative Incentive Awards of $500.00 for each Lead
Plaintiff, and (ii) Individual payments of $4,500 for each Lead Plaintiff on account
of their execution of additional individual releases broader than Settlement Class
Member releases and their additional agreements to refrain from seeking future
employment with Defendant.  (Id. ¶ 5.4.)  The Court's approval of Class
Representative Incentive Awards is not a material term of the Agreement, and any
different amount shall be allocated to the NSA or from the GSA.  (Id. ¶ 5.4.1.)

5

### 5. PAGA and LWDA Payments

Plaintiffs will also seek approval from the Court for a PAGA payment from the Gross Settlement Amount of $10,000 and for LWDA Payment of from the Gross Settlement Amount of $7,500.  (Id. ¶ 5.6.)

### 6. Notice

Plaintiffs requested that the Court appoint CPT Group, Inc. or another administrator mutually agreed upon by the parties, as Settlement Administrator, also referred to as the Claims Administrator, for purposes of sending notice of the settlement to Class Members.  (Id. ¶ 3.1.)  The Parties agree Settlement Administrator Costs shall not exceed $27,000.  (Id.)

On May 3, 2018, the Claims Administrator sent the Class Notice, Class Form, and Request from Exclusion form to the Class Members via first-class regular U.S. mail using the mailing address information provided by Defendant pursuant to the Court's Preliminary Approval Order.  (Mot. at 13-14; Settlement Agreement ¶ 3.5.)  The Class Notice: (1) describes the nature of the Action; (2) defines the class and Plaintiffs' claims; (3) explains that Class Members may enter an appearance through an attorney and will be excluded upon request; (4) outlines the time and manner of requesting exclusion; and (5) explains the binding effect of a class-wise judgment.  (Mot. at 13-14.)

The Class Notice also explains that Class Members may object and provides: (1) the time and place of the Final Approval Hearing; (2) the address and telephone number of Class Counsel and the procedure for making inquiries; (3) information about the contemplated deductions from the GSA; and (4) the procedures for allocating the Net Settlement Sum to Participating Class Members.

6

(Id.)  In the event that any Class Notice Packet is returned as undeliverable, the Settlement Administrator shall promptly forward the Class Notice Packet to the affixed forwarding address if provided.  (Settlement Agreement ¶ 3.5.)  Otherwise, the Settlement Administrator shall promptly attempt to determine the correct address using a skip-trace search and will then promptly send a single re-mailing. (Id.)

The Class Members have 45 days from the date of the initial mailing to submit Claim Forms or Request from Exclusion forms or raise objections.  (Mot. at 14; Settlement Agreement ¶¶ 4.1, 4.4.)  If a Class Member submits both a Request for Exclusion and raises an objection, the Request for Exclusion will be deemed invalid.  (Settlement Agreement ¶ 4.4.)  Class Member responses postmarked more than 45 day after the initial mailing of the Class Notice shall not be considered.  (Id. ¶ 4.1.)

### C. Class Notice

On April 19, 2018, CPT, the Settlement Administrator, received a data file from Defense Counsel containing Class Members' names, last known mailing addresses, social security numbers, employment status, and employment data. (Doc. No. 48-1 ("Garrido Decl.") ¶ 5.)  The final list contained names of 2,940 Class Members.  (Id.)  CPT then sought to confirm the address list data by cross-checking the list with a National Change of Address database and mailed the Class Notice and Claim Form to Class Members on May 3, 2018.  (Id. ¶¶ 6-7.) CPT received one additional request to be added to the Class, which was approved by Defense Counsel, resulting in a final Class Member count of 2,941. (Id. ¶ 8.)

As of June 25, 2018, 258 Notice Packets were returned to CPT.  (Doc. No. 51-1 ("Suppl. Garrido Decl.") ¶ 3.)  237 of the Packets have been re-mailed after CPT performed a skip-trace to identify updated mailing information.  (Id. ¶¶ 4.)  29 Notice Packets have been deemed undeliverable with no forwarding address.  (Id. ¶ 4.)

As of June 18, 2018, the date of the claims expiration period, CPT received one written Request for Exclusion.  (Id. ¶ 8)  CPT did not receive any objections or disputes.  (Id. ¶¶ 6-7.)  No Class Members objected at the final approval hearing on July 2, 2018.  479 Class Members filed a claim, including 2 Late Claims and 6 Deficient Claims.  (Id. ¶ 9.)  There is no indication that the parties have agreed to accept the late or deficient claims.

If the Court were to accept all proposed fees and costs requested by Plaintiffs, CPT estimates the individual settlement payout amounts to be $737.25 given the current participation rate and assuming the late and deficient claims are accepted.  (Id. ¶ 10.)

## II.    JUDICIAL NOTICE

Plaintiffs also request that the Court take judicial notice of three exhibits.  (Doc. No. 47-3 ("RJN").)

The first exhibit (Exhibit 7) is a tentative ruling on a motion for attorney's fees and final approval of class action settlement from another case in the Central District of California.  "[W]hile the records of other courts, even tentative rulings, may be proper for judicial notice, such notice is granted 'only for the limited purpose of recognizing the judicial act that the order [or filing] represents on the subject matter of the litigation.'"  Perretta v. Prometheus

Dev. Co., Inc., No C-05-02987 WHA, 2005 WL 3445627, at *3 (N.D. Cal. Dec. 15, 2005) (quoting *Lee v. Bender*, C-04-2637, 2005 WL 1388968, at *8 (N.D. Cal. May 11, 2005)) (formatting in original); see also United States v. S. California Edison Co., 300 F. Supp. 2d 964, 974 (E.D. Cal 2004) ("While the authenticity and existence of a particular order, motion, pleading or judicial proceeding, which is a matter of public record, is judicially noticeable, veracity and validity of its contents (the underlying arguments made by the parties, disputed facts, and conclusions of applicable facts or law) are not."). A tentative order does not express a court's final decision, and the court may enter a wholly different judgment than that set forth in a tentative order. Thus, while Exhibit 7 is the proper subject of judicial notice, the Court DENIES Plaintiffs' first request as the order is not relevant to the outcome of this Motion.

The second exhibit (Exhibit 8) is the adjusted Laffey matrix. Plaintiffs do not present adequate evidence for the Court to conclude that the adjusted Laffey matrix is not subject to reasonable dispute, as is required under Federal Rule of Evidence 201(b). Accordingly, the Court DENIES Plaintiffs' second request.

The third exhibit (Exhibit 9) are two 2017 salary tables published by the U.S. Office of Personnel Management reflecting the locality pay differentials for Washington, D.C. and Los Angeles, California. "Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies." *U.S. ex rel. Modglin v. DJO Glob. Inc.*, 48 F. Supp. 3d 1362, 1381 (C.D. Cal. 2014), *aff'd sub nom. United States v. DJO Glob.,*

*Inc.*, 678 F. App'x 594 (9th Cir. 2017) (quoting *Hansen Beverage Co. v. Innovation Ventures, LLC,* No. CV-08-1166-IEG, 2009 WL 6597891, *1 (S.D.Cal. Dec. 23, 2009)).  While the proper subject of judicial notice, the Court DENIES Plaintiffs' third request as these tables do not contain adjudicative facts related to Plaintiffs' Fee Motion.

## III.    DISCUSSION

### A.  Final Approval of the Settlement Terms

Under Rule 23(e) of the Federal Rules of Civil Procedure, "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."  Fed. R. Civ. P. 23(e).  A court should approve a settlement pursuant to Rule 23(e) only if the settlement "is fundamentally fair, adequate and reasonable."  Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1375 (9th Cir. 1993); accord In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 458 (9th Cir. 2000) (citing Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998)).  The court "must evaluate the fairness of a settlement as a whole, rather than assessing its individual components."  Lane v. Facebook, Inc., 696 F.3d 811, 818-19 (9th Cir. 2012).

"[W]hen (as here) the settlement takes place before formal class certification, settlement approval requires a 'higher standard of fairness.'"  Id. at 819.  This is "to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent."  Id. (citations and formatting omitted).

"[T]he settlement may not be the product of collusion among the negotiating parties."  In re Mego Fin. Corp. Sec. Litig., 213 F.3d at 458.  In addition, a court

must balance the following factors to determine whether a class action settlement is fair, adequate, and reasonable:

1. the strength of the plaintiff's case;

2. the risk, expense, complexity, and likely duration of further litigation;

3. the risk of maintaining class action status throughout the case;

4. the amount offered in settlement;

5. the extent of discovery completed and the stage of the proceedings;

6. the experience and views of counsel;

7. the presence of a governmental participant; and

8. the reaction of the class members to the proposed settlement.

Torrisi, 8 F.3d at 1375; accord Linney v. Cellular Alaska Partnership, 151 F.3d 1234, 1242 (9th Cir. 1998); Hanlon, 150 F.3d at 1026.

The factors are not exclusive, and one factor may deserve more weight than the others depending on the circumstances.  Torrisi, 8 F.3d at 1376.  In some instances, "one factor alone may prove determinative in finding sufficient grounds for court approval."  Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 525, 525–26 (C.D. Cal. 2004) (citing Torrisi, 8 F.3d at 1376).  In addition, "[t]he involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair."  Linney v. Cellular Alaska P'ship, No. C-96-3008-DLJ, 1997 WL 450064, *5 (N.D. Cal. July 18, 1997), aff'd, 151 F.3d at 1234.

### 1.  Product of Serious, Informed, Non-Collusive Negotiations

To approve the settlement at this stage, the Court must find first it is "not the product of fraud or overreaching by, or collusion between, the negotiating parties." Hanlon, 150 F.3d at 1027.  The settlement between the Parties "was negotiated in light of all known facts and circumstances — including the potential difficulty of proving Plaintiffs' claims, potential defenses, the uncertainty associated with litigation, the risks of significant delay, and numerous potential appellate issues." (Harris Decl. ¶ 6.)  ATS's counsel provided Class Counsel with information regarding the size of the Settlement class and the number of cancelled meal breaks during the class period.  (Id. ¶ 7.)  "Class counsel were thus able to calculate potential damages with precision."  (Prelim. Appr. Order at 20.)

The Agreement is the result of "more than 16 months of negotiations and exchange of information between the Parties following the initial mediation," and was conducted with the assistance of Lisa Klerman, "an experienced mediator of cases involving the wage and hour laws at issue in the Action."  (Harris Decl. ¶¶ 4, 6.)  The Agreement thus appears to be the product of serious, informed, and non-collusive negotiations.  Moreover, "[t]he assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive."  Satchell v. Fed. Express Corp., Nos. C-03-2659 SI, C-03-2878 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007).  This factor weighs in favor of final approval.

### 2.    Strength of Plaintiffs' Case and Future Risks[1]

In assessing the strength of the case, the Court need not "reach any ultimate conclusions on the contested issues of fact and law which underlie the

---

[1] As the first three Hanlon factors — strength of the plaintiff's case; the risk, expense, complexity, and likely duration of future litigation; and the risk of maintaining class

merits of the dispute, for it is the very uncertainty of [the] outcome in litigation and
avoidance of wasteful and expensive litigation that induce consensual
settlements."  Officers for Justice v. Civil Serv. Comm'n of San Francisco, 688 F.2d
615, 625 (9th Cir.1982).  As to risk, the Court may "consider the vagaries of
litigation and compare the significance of immediate recovery by way of the
compromise to the mere possibility of relief in the future, after protracted and
expensive litigation."  Vasquez v. Coast Valley Roofing, Inc., 266 F.R.D. 482, 489
(E.D. Cal. 2010) (citation omitted).  "In most situations, unless the settlement is
clearly inadequate, its acceptance and approval are preferable to lengthy and
expensive litigation with uncertain results."  Nat'l Rural Telecomms. Coop., 221
F.R.D. at 526 (internal quotation marks omitted).

        As noted in the Court's preliminary approval order, Plaintiffs' claims do not
appear particularly strong.  (Prelim. Appr. Order at 16.)  Class Counsel identify a
number of risks Plaintiffs face if litigation continues.  Specifically, Class Counsel
acknowledges Defendant's assertion that the Airline Deregulation Act ("ADA"), 49
U.S.C. § 41713, preempts Plaintiff's meal-break claims.  (Mot. at 17.)  "If
preemption applies, *none* of the Settlement Class are entitled to *any* meal-break
damages."  (Id. (emphasis in original).)  Other courts have supported this
preemption assertion.  See e.g., Angeles v. U.S. Airways, Inc., No. C-12-05860-
CRB, 2013 WL 622032, at *8 (N.D. Cal. Feb. 19, 2013) ("Plaintiffs' meal period
and rest break claims . . . are preempted by the ADA."); Blackwell v. SkyWest
Airlines, Inc., No. CV-06-0307-DMS (AJB), 2008 WL 5103195, at *15-18 (S.D. Cal.
Dec. 3, 2008) (same).

_____

action status throughout the trial — are interrelated, the Court discusses them
together here.  Hanlon, 150 F.3d at 1026.

Additionally, Class Counsel acknowledges Defendant's "potentially dispositive defense" that it is not a temporary service employer, therefore preventing Plaintiffs from collecting damages for wage statement violations. (Mot. at 17-18.) Class action treatment of Plaintiffs' expense reimbursement claim may be precluded because of Defendant's denial that it directed employees to dry clean their uniforms, and thus this claim would require individualized inquiries. (Id. at 18.) Plaintiffs' unlawful deduction claim is similarly in jeopardy, as Defendant argues that Plaintiffs lack standing to bring the claim and that the claim is barred by the statute of limitations under PAGA. (Id.) Finally, Defendant challenges the merits of the regular rate-based overtime claim. (Id.)

Plaintiffs concede that "[t]he defenses raised by ATS potentially eliminate *any* liability for Plaintiffs' meal period, pay-stub, expense reimbursement, unlawful deduction, overtime and derivative continuing-wage claims." (Id. (emphasis in original).) Ultimately, Plaintiffs risk dismissal of class allegations, an adverse decision on the merits, unfavorable motion rulings, and the possibility that a trial would return a less favorable verdict. (Id.) Moreover, if Plaintiffs' claims survive Defendant's asserted defenses, litigation is expected to last several years. (Mot. at 18.) Therefore, based on Class Counsel's assessment of the strength of Plaintiff's case and the "substantial" risks and costs associated with future complex litigation, these three factors weigh in favor of approval.

### 3.    Amount Offered in the Settlement

In order to "determine whether the settlement amount is reasonable, the Court must consider the amount obtained in recovery against the estimated value of the class claims if successfully litigated." Millan v. Cascade Water Servs. Inc., 310 F.R.D. 593, 611 (E.D. Cal. 2015) (citing Litty v. Merrill Lynch & Co., Inc., No.

14

CV-14-0425-PA, 2015 WL 4698475, at *9 (C.D. Cal. April 27, 2015) ("In determining whether the amount offered in settlement is fair, the Ninth Circuit has suggested that the Court compare the settlement amount to the parties' 'estimate of the maximum amount of damages recoverable in a successful litigation.'") (quoting In re Mego, 213 F.3d at 459).  A proposed settlement may be fair, adequate, and reasonable, even though greater recovery might be available to the class members at trial.  See Linney, 151 F.3d at 1242; Officers for Just., 688 F.2d at 628 ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not per se render the settlement inadequate or unfair."); Millan, 310 F.R.D. at 611 ("Even a fractional recovery of the possible maximum recovery amount may be fair and adequate in light of the uncertainties of the trial and difficulties in proving the case").  Further, the Ninth Circuit has long deferred to the parties' private, consensual decisions.  See Hanlon, 150 F.3d at 1027.

While not entirely clear from Plaintiffs' Motion, the declaration of Plaintiffs' counsel, Alan Harris, details the estimated value of the class claims if successfully litigated.  (*See* Harris Decl.)  As to Plaintiffs' first claim, meal break violations, Class Counsel explains that "[d]uring discovery, Class Counsel was able to establish that there were some 2,422 instances when [the Class] might be able to prove liability for premium wages on account of missed meals on a class wide basis.  Assuming an average hourly wage of $14.77, the total damages would amount to $35,772.94."  (Id. ¶ 7.)  Defendant has argued that "Plaintiffs' meal break claims are preempted under the Airline Reregulation Act."  (Id. ¶ 15.)  Plaintiffs note that "if preemption applies, *none* of the Settlement Class are entitled to *any* meal-period damages."  (Id. (emphasis in original).)

As to their second claim for wage statement violations, Plaintiffs allege
Defendant failed to comply with California Labor Code section 226 by failing "to
record properly the additional wages owed to Plaintiffs on account of overtime
wages owed to them."  (Id. at ¶ 9.)  Plaintiffs also allege that "[a]lthough ATS is a
temporary services employer, the wage statements also fail to provide the rate of
pay and total hours worked for each temporary service assignment" on employees'
wage statements.  (Id.)  Class Counsel estimates that each employee is entitled to
recover up to $4,000 for these violations, "limited to the period commencing one
year before filing this suit."  (Id.)  Counsel indicates that hundreds of workers
would be able to recover under this claim, and those damages, combined with
PAGA penalties, would result in "several million dollars" in damages.  (Id.)
Counsel explains that they "substantially discounted" this sum in the settlement
because there are "substantial problems in establishing liability" and recovering
damages for this claim.  (Id.)  In particular, Defendant has argued that it is not a
"temporary service employer" and therefore not liable for these damages.  (See id.
¶ 16.)  Were Defendant to prevail on this argument, Plaintiffs would not be entitled
to any of these damages.  (Id.)

Plaintiffs allege in their third claim that Defendant failed to reimburse hourly
employees for the cost of maintaining their uniforms despite its obligation to do so.
(Id. ¶ 10.)  Plaintiffs estimate that about 600 employees are entitled to recover $5
per month for dry cleaning costs, resulting in $36,000 per year in overall damages
for these 600 employees.  (Id.)  Plaintiffs fail to provide a total amount recoverable
under this claim, but assuming there were 600 employees entitled to this recovery
per year for the duration of the Class period, i.e. six and a half years, the total
maximum potential recovery for this claim is $234,000.  Defendant has disputed
that it directed employees to dry clean their uniforms and asserts that

16

"individualized inquires would preclude class action treatment of this claim."  (Id. ¶ 17.)

Plaintiffs do not seek monetary damages in their fourth claim for comingling the security deposits employees paid for uniforms with other funds.  (SAC ¶¶ 69-71.)  Rather, Plaintiffs sought a declaratory judgment that Defendant's practices violated California Labor Code section 403, 404, and 405, and an injunction for further or continued deductions from employees' pay.  (Id.)  Class Counsel notes that in addition to the monetary settlement, Defendant also agreed to stop taking security deposits for uniforms in August 2017 and no longer requires security deposits.  (Harris Decl. ¶ 13.)

Plaintiffs allege in their fifth claim that Defendant made unlawful deductions from employees' pay for uniform maintenance in violation of California Labor Code section 221.  (Id. ¶ 11.)  These deductions, along with the accrued interest, result in damages in excess of $50,000.  (Id.)  Defendant has argued, however, that "there is no private right of action for a Code § 221 claim and [the claim] is therefore subject to a one-year statute of limitations under PAGA."  (Id. ¶ 18.)  Defendant also challenges whether Plaintiffs have standing to bring this claim on the same grounds.  (Id.)

As to their sixth claim for unpaid overtime, Plaintiffs allege two types of injuries, resulting in an estimated maximum total possible recovery of $72,500.  First, they estimate sixty employees working alternative workweeks suffered less than a total of $12,500 in damages.  (Id. ¶ 8.)  Defendant disputes these damages, contending that it complied with the wage laws governing a circumstance where an employee elects to work an alternative workweek of four days, ten hours per day, all paid at straight-time wages.  (Id.)  Second, Plaintiffs allege Defendant

failed to compute properly the applicable regular pay rate, resulting in an estimated loss of less than $60,000. (Id.)

In their seventh claim, Plaintiffs seek to recover continuing wages for Defendant's alleged overtime and meal period violations under California Labor Code section 203. (Id. ¶ 12.) Plaintiffs estimate that each employee would be potentially entitled to $3,544.80 in continuing wage penalties. (Id.) If the entire Class — i.e. 2,941 employees — established liability, Plaintiffs could collectively recover $10,425,256 in damages for continuing wages. (Id.) Damages for continuing wages are not included in the settlement. Plaintiffs do not explain why these penalties are excluded from the settlement. (See id.)

Plaintiffs' eighth claim for unfair competition is restitutionary in nature, and the estimated possible recovery is already captured by calculation of damages for other claims. See Korea Supply Co. v. Lockheed Martin Corp., 29 Cal. 4th 1134, 1144, 63 P.3d 937, 943 (2003) ("A UCL action is equitable in nature; damages cannot be recovered. . . [U]nder the UCL, [p]revailing plaintiffs are generally limited to injunctive relief and restitution.") (second alteration in original) (citations omitted).

Plaintiffs' remaining claims are for Defendant's alleged failure to produce employment records upon request pursuant to California Labor Code sections 226(b) and 1198.5 and are made on behalf of three individuals. (SAC ¶¶ 100, 104.) Because they are not class claims, they are omitted from the maximum possible recovery calculation.

Based on the above, the maximum potential recovery for Plaintiffs' first, third, fifth, and sixth claims is $394,272.94. Plaintiffs' second and seventh claim

provide for upward of $11,000,000, but there are significant doubts as to whether Plaintiffs could prove liability under these claims. Additionally, "settlement is about compromise, a yielding of the highest hopes in exchange for certainty and resolution." Gong-Chun v. Aetna Inc., No. CV-09-01995-SKO, 2012 WL 2872788, at *15 (E.D. Cal. July 12, 2012) (quoting In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 257 (D. Del. 2002)). Thus, although the settlement amount is several millions of dollars lower than the maximum possible recovery, the Court finds that this factor weighs in favor of approval of the final settlement.

### 4. Extent of Discovery Completed and Stage of the Proceedings

This factor requires the Court to evaluate whether "the parties have sufficient information to make an informed decision about settlement." Linney, 151 F.3d at 1239. Where the parties have conducted extensive discovery, this factor favors final approval "because it suggests that the parties arrived at a compromise based on a full understanding of the legal and factual issues surrounding the case." Nat'l Rural Telecomms. Coop., 221 F.R.D. at 527 (internal quotation marks omitted).

Both sides have "investigated the claims against Defendant and also analyzed any and all applicable defenses raised by Defendant. This investigation included work conducted in connection with a prior class action lawsuit, . . . the exchange of information and documentation pursuant to informal discovery methods, service of formal discovery, numerous conferences between [Class Counsel] and Defendant's Counsel, and [Class Counsel's] interviews of Plaintiffs and Class Members." (Harris Decl. ¶ 3.)

"Given the parties' attempts at an early resolution of this case, Plaintiffs have not had occasion to undertake any 'formal' discovery." (Mot. at 20.)

However, informal discovery completed includes: (a) information as to the size of the Settlement Class, (b) total number of cancelled breaks during the class period, (c) information regarding the security deposits maintained by Defendant, and (d) the alternative workweek elections held by Defendant.  (Id. (citing Harris Decl. ¶¶ 7-11).)  "In addition, Class Counsel undertook their own independent investigation to inform their negotiating position, including risk re-evaluation in light of the potentially dispositive defenses."  (Id. at 20 (citing Harris Decl. ¶¶ 3, 8).)  Class Counsel was also involved in a related class action lawsuit against the same defendant, Collette McDonald v. Airport Terminal Services, No. CV-11-01946-VAP (SPx) (C.D. Cal. 2011), and conducted investigation related to that lawsuit.  (Mot. at 4); see Linney, 151 F.3d at 1239-40 ("In the context of class action settlements, formal discovery is not a necessary ticket to the bargaining table where the parties have sufficient information to make an informed decision about settlement.  In particular, the district court and plaintiffs may rely on discovery developed in prior or related proceedings.") (formatting and citations omitted).

Despite the lack of formal discovery here, the Court finds that the parties had sufficient information to make an informed decision regarding settlement. Accordingly, the Court finds this factor weighs in favor of approval.

### 5.    Experience and Views of Counsel

When the Court considers class action settlement agreements, it gives "'great weight' . . . to the recommendation of the attorneys."  Vasquez, 266 F.R.D. at 489) (internal citation omitted).  "This is because '[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation.'"  Nat'l Rural

Telecomm. Coop., 221 F.R.D. at 528 (quoting In re Pacific Enters. Sec. Litig., 47 F.3d 373, 377 (9th Cir. 1995)) (alteration in original).

Here, Class Counsel represent that they have ample experience litigating class actions similar to this case and has demonstrated the ability to prosecute vigorously on behalf of the Class Members.  (Harris Decl. ¶¶ 20-21.)  Class Counsel also detail their experience litigating labor law disputes.  (Id.)  In light of their experience and their view that the Settlement Agreement represents a "fair, reasonable, and adequate resolution of this case," (Id. ¶ 22), the Court finds this factor weighs in favor of approval.

### 6.    Presence of a Governmental Participant

There is no governmental participant in this action, but Plaintiff brought claims under California's PAGA on behalf of the state and affected employees. Under PAGA, the LWDA is entitled to 75 percent of any settlement of civil penalties awardable under the Labor Code.  See Cal. Labor Code § 699(i) ("Except as provided in subdivision (j), civil penalties recovered by aggrieved employees shall be distributed as follows: 75 percent to the Labor and Workforce Development Agency for enforcement of labor laws and education of employers and employees about their rights and responsibilities under this code, to be continuously appropriated to supplement and not supplant the funding to the agency for those purposes; and 25 percent to the aggrieved employees.").

The Settlement Agreement provides for a $7,500 payment to the LWDA. (Settlement Agreement ¶ 5.6.)  This amount is consistent with settlement approval of PAGA awards by other California district courts.  See, e.g., Garcia v. Gordon Trucking, Inc., No. CV-10-0324-AWI (SKOx), 2012 WL 5364575, at *11 (E.D. Cal. Oct. 31, 2012) (approving payment of $7,500 to the LWDA, 0.2 percent of the $3.7

million total settlement amount, in satisfaction of plaintiffs' PAGA claims); <u>Chu v. Wells Fargo Invs., LLC</u>, No. C-05–4526-MHP, C06-7924-MHP, 2011 WL 672645, at *1 (N.D. Cal. Feb. 16, 2011) (approving PAGA settlement payment of $7,500 to the LWDA out of $6.9 million common-fund settlement, equaling 0.1 percent of the total settlement amount); <u>Singer v. Becton Dickinson & Co.</u>, No. CV-08-821-IEG (BLMx), 2010 WL 2196104, at *1–2 (S.D. Cal. June 1, 2010) (approving payment of $3,000 to the LWDA, 0.3 percent of the $1 million gross fund value, for PAGA penalties).  Thus, the Court finds that the $7,500 payment to the LWDA is fair. This factor weighs in favor of approval.

### 7.    Reaction of the Class Members to the Proposed Settlement

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms . . . are favorable to the class members."  <u>Nat'l Rural Telecomms. Coop.</u>, 221 F.R.D. at 529.

In accordance with the Court's Preliminary Approval Order, which approved the proposed notice and notice form, the Settlement Administrator mailed the Notice Packets, as discussed above.  The Claim Form explains in plain language the nature of the case, what the recipient is entitled to, and what the recipient must do next.  (Harris Decl., Ex. 2.)  The Notice states the class members' options—do nothing, submit a claim form, opt out of the class, or object to the settlement—and describes the consequences attached to each decision.  (<u>Id</u>.)

As of June 25, 2018, 2,912 Notice Packets were successfully delivered out of the 2,941 Packets mailed to Class Members.  (Garrido Suppl. Decl. ¶ 4.)  479 Class members have filed a claim, including 2 late claims and 6 deficient claims.

(Id. ¶ 9.)  One Class Member opted-out, and no Class Members have objected to nor disputed the settlement.  (Id. ¶¶ 6-8.)

Given the low number of requests for exclusion and the absence of any objections to the terms or conditions of the Settlement, the Class response is favorable overall.  Accordingly, this factor also weighs in favor of approval.

## B.    Balance of Factors

In sum, these factors support approving the Settlement Agreement.  The Court determines that the amount offered in settlement is fair, reasonable, and adequate.  Accordingly, the Court APPROVES Plaintiffs' Final Approval Motion.

## C.    Attorneys' Fees

Notwithstanding an explicit agreement to shift attorneys' fees in a certified class action, "courts have an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount."  In re Bluetooth Headset Prods. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011).

When evaluating attorneys' fees, the Ninth Circuit has held that "the district court has discretion in common fund cases to choose either the percentage-of-the-fund or the lodestar method."  Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1047 (9th Cir. 2002) (citing In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1295–96 (9th Cir.1994)).  Plaintiffs seek to employ the percentage-of-the-fund method, whereby Class Counsel request $200,000 — or 33.33% — of the gross $600,000 settlement fund for attorneys' fees.  (See Fees Mot.).

When using the percentage-of-the-fund method, "courts typically set a benchmark of 25% of the fund as a reasonable fee award, and justify any increase or decrease from this amount based on circumstances in the record." Monterrubio v. Best Buy Stores, L.P., 291 F.R.D. 443, 455 (E.D. Cal. 2013); see Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989). The percentage may be adjusted upward or downward based on (1) the results achieved; (2) the risks of litigation; (3) the skill required and the quality of work; (4) the contingent nature of the fee; and (5) the awards made in similar cases. In re Omnivision Techs., Inc., 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2008) (citing Vizcaino, 290 F.3d at 1048–50). The Court addresses these factors below.

### 1. Results Achieved, Risks of Litigation, and Contingent Nature of the Fees

Class Counsel contend that the results achieved are exceptional because (1) Class Members would receive on average $102 each, assuming the Court awarded all requested fees, which represents "a significant portion of their actual damages;" and (2) the results are far more than what the Class Members would have gotten had Defendant prevailed on one of their dispositive defenses. (Fees Mot. at 18-19.) Additionally, Class Counsel highlight that they undertook this litigation on a contingent-fee basis. (Id.)

Counsel's first argument is not persuasive, as they do not provide a calculation of the actual damages incurred by Class Members, despite repeatedly asserting that $102 is a "significant portion" of the actual damages. Their second argument fares no better; reaching a settlement whereby plaintiffs recover some monetary damages is a threshold achievement and does not support a finding of "exceptional" results. While the results here are favorable, they are not exceptional.

Additionally, although Counsel represented Plaintiffs on a contingency-fee
basis, the Court finds that this was a particularly low-risk case as Class Counsel
had previously represented another class against the same defendant in a
remarkably similar case, which also resulted in settlement.  See Collette
McDonald v. Airport Terminal Services, No. CV-11-01946-VAP (SPx), 2013 WL
12251409 (C.D. Cal. Nov. 19, 2013).  Thus, the Court finds that the result
achieved and risks of litigation factors weigh against departing upward from the
25% benchmark, and the contingent nature of the fees factor is neutral.

### 2.   Skill and Quality of the Work

While the Court does not doubt Class Counsel are experienced and skilled
litigators, they have not shown the kind of exceptional skill or quality of work to
warrant a departure from the 25% benchmark.  The attorney time reasonably
dedicated to this case was limited; the parties settled before there was any motion
practice; the legal issues presented were neither complex nor novel; and, as
previously noted, Counsel had previously addressed nearly identical issues
against the same defendant in a prior case.  Further, the skill and ability of
Plaintiff's counsel exhibited in the instant motions is not exceptional: for example,
Counsel cites to Rodriguez v. West Pub. Corp., No. CV-05-3222-R, 2007 WL
2827379 (C.D. Cal. Sept. 10, 2007), for a finding in another case, and fails to note
that the order was reversed in part by the Ninth Circuit.  Thus, this factor weighs
against departing upward from the 25% benchmark.

### 3.   Awards Made in Similar Cases

Class Counsel does not explicitly discuss this factor in their Fees Motion.
The Court nevertheless notes that the Ninth Circuit maintains a clear directive that

25% of the common fund is the "benchmark" for a reasonable fee award.  In re Bluetooth, 654 F.3d 935, 945.  Indeed, courts regularly adhere to this benchmark when awarding fees in wage and hour class actions.  See Brooks v. Life Care Centers of Am., Inc., No. SACV-12-00659-CJC (RNBx), 2015 WL 13298569, at *4 (C.D. Cal. 2015) ("Awarding the benchmark in mine run of wage and hour cases appears to be standard in this District."); see also Bravo v. Gale Triangle, Inc., No. CV-16-03347-BRO (GJSx), 2017 WL 708766, at *16 (C.D. Cal. Feb. 16, 2017) (rejecting an upward departure from the benchmark and noting that, "while some courts have found that an upward adjustment is supported in wage and hour class action cases, other courts have not, or have found that such adjustments are supported only when the results are exceptional"); Monterrubio, 291 F.R.D. at 457-58 (rejecting the class counsel's request for a departure from the 25% benchmark in what the court deemed "a garden-variety wage and hour class action").  While courts may sometimes depart from the benchmark, Class Counsel have not established that such a departure is warranted here.  Accordingly, this factor weighs against departing from the 25% benchmark.

### 4.    Lodestar Cross-Check

"Courts may apply the lodestar method as a 'cross-check'" on the reasonableness of a percentage-based fee award."  Bravo, 2017 WL 708766, at *17 (citing Vizcaino, 290 F.3d at 1050).  "[W]hile the primary basis of the fee award remains the percentage method, the lodestar may provide a useful perspective on the reasonableness of a given percentage award."  Vizcaino, 290 F.3d at 1050.

The lodestar is "calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate."  Morales v. City of San Rafael, 96 F.3d, 359, 363 (9th Cir. 1996).  "To inform and assist the

court in the exercise of its discretion, the burden is on the fee applicant to produce satisfactory evidence — in addition to the attorney's own affidavits — that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 980 (9th Cir. 2008) (quoting Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984)).  The "relevant community" for purposes of the "prevailing market rate" is the "forum in which the district court rests."  Id. at 979.

Class Counsel's lodestar calculation of $350,849.50 is of limited use as a cross-check because their hours are significantly inflated.  (Fees Mot. at 12.)  For example, Class Counsel billed 50.1 cumulative hours for the research, preparation, and drafting of a complaint that is substantially identical to the complaint filed in Collette, No. CV-11-01946-VAP (SPx).  In the Collette McDonald case, the same counsel spent a total of 8.1 hours researching and drafting the complaint, (see No. 11-CV-01946-VAP, Doc. Nos. 39-3, 40-1.)  There is no reasonable justification the Court can see why it would take more than six times as long to research and draft the complaint here, even accounting for the amendments.

Class Counsel's hourly logs contain multiple instances of excessive billing, particularly in time billed for correspondence and communication.  For instance, Mr. Harris billed 0.1 hours — i.e. $80 — for a number of items that would have required a fraction of that time, such as sending a 15 word email to defense counsel on February 23, 2016; a one-sentence email to the mediator on June 22, 2016 confirming the date of the mediation; and an email to two people simply

requesting they call him.  Aside from being excessive, many of these items are also clerical tasks and not appropriate to bill at partner rates.

Counsel billed for 15 hours of time they anticipate working in the future.  The Court does not reimburse for anticipated work.

Further, Class Counsel was comprised of five lawyers and a paralegal.  The same lead partners, Mr. Harris and Mr. Dorigan, represented the plaintiffs in the similar prior case, Collette McDonald, with a total of three attorneys and no paralegals.  (See Collette, Doc. Nos. 39, 40.)  The additional staff resulted in having more attorneys attending meetings or teleconferences — i.e. many duplicative time entries.  For example, much of Mr. Mohan's reported time was spent reviewing the same correspondence and attending the same meetings as Mr. Harris.  Similarly, many of the entries billed by the paralegal, Ms. Dorigan, were duplicative of the attorneys assisting Mr. Harris and of Mr. Dorigan's time.

Finally, while the attorneys' hourly rates proposed by Counsel are acceptable for purposes of using the lodestar as a cross-check, the hourly rate of the paralegal staffed on this case — $220 per hour — is not supported adequately and above the customary rates of the market.  See Ingram v. Oroudijian, 647 F.3d 925, 928 (9th Cir. 2011) (holding that the district court may rely on its own knowledge of customary rates and its familiarity with the legal market where the hourly rate is not supported adequately).  Accordingly, the Court reduces Ms. Dorigan's rate from $220 per hour to $100 per hour.

Because the lodestar calculation here is used as a cross-check, it does not require mathematical precision.  See Schiller v. David's Bridal, Inc., No. CV-10-00616-AWI, 2012 WL 2117001, at *20 (E.D. Cal. June 11, 2012) ("Where the use

28

of the lodestar method is used as a cross-check to the percentage method, it can be performed with a less exhaustive cataloguing and review of counsel's hours."). In light of the issues discussed above with Class Counsel's lodestar calculation, Counsel has not shown that a reasonably calculated lodestar amount entitles them to more than the 25% benchmark.

     **5.**   <u>**Conclusion**</u>

In sum, none of the factors weigh in favor of departing from the 25% attorneys' fee award benchmark, with four factors weighing against departure and one neutral factor.  The Court's adjusted lodestar calculation likewise indicates that a benchmark award is appropriate.  Accordingly, the Court DENIES Class Counsel's request for attorneys' fees in the amount of 33% of the GSA.  Instead, the Court AWARDS attorneys' fees in the amount of 25% of the GSA ($150,000.00).

     **D.**   **Costs**

According to the Agreement, Class Counsel will apply to the Court for reimbursement out of the settlement fund for costs associated with the prosecution of the class action up to $12,000.  (Settlement Agreement ¶ 5.3.)  Class Counsel seeks $9,357.47 for costs incurred in the prosecution of this case.  (Fees Mot. at 22.)  Counsel submitted a detailed accounting of these expenses, which the Court has carefully reviewed.  (Doc. Nos. 47-2 at 22; 48-2, Ex. 5; 51.)  The Court finds that reimbursement of those expenses is reasonable, except for $398.23 in meal expenses incurred on July 7, 2015 and November 8, 2016.  Accordingly, the Court APPROVES a reimbursement of $8, 959.24.

### E.    Incentive Awards

Named plaintiffs "are eligible for reasonable incentive payments."  <u>Staton</u>,
327 F.3d at 977.  Such awards "are fairly typical in class action cases," and "are
intended to compensate class representatives for work done on behalf of the
class, to make up for financial or reputational risk undertaken in bringing the
action, and, sometimes, to recognize their willingness to act as a private attorney
general."  <u>Rodriguez v. W. Publ'g Corp.</u>, 563 F.3d 948, 958–59 (9th Cir. 2009).
"The district court must evaluate [incentive] awards individually, using 'relevant
factors includ[ing] the actions the plaintiff has taken to protect the interests of the
class, the degree to which the class has benefitted from those actions, . . . the
amount of time and effort the plaintiff expended in pursuing the litigation . . . and
reasonabl[e] fear[s of] workplace retaliation.'"  <u>Staton</u>, 327 F.3d at 977.  Courts
may also consider: the risk to the class representative in commencing suit, both
financial and otherwise; the notoriety and personal difficulties encountered by the
class representative; the amount of time and effort spent by the class
representative; the duration of the litigation; and the personal benefit (or lack
thereof) enjoyed by the class representative as a result of the litigation.  <u>Van
Vranken v. Atl. Richfield Co.</u>, 901 F. Supp. 294, 299 (N.D. Cal. 1995).  "Courts
have generally found that $5,000 incentive payments are reasonable."  <u>Alberto</u>,
252 F.R.D. at 669.

Under the Agreement, Plaintiffs will apply to the Court for an award of
(i) Class Representative Incentive Awards of $500.00 for each named plaintiff, and
(ii) Individual payments of $4,500 for each named plaintiff on account of their
execution of additional individual releases broader than Settlement Class Member

releases and their additional agreements to refrain from seeking future employment with Defendant.  (Id. ¶ 5.4.)

Plaintiffs seek a class representative incentive award of $500 to each named Plaintiff for efforts in prosecuting this action on behalf of Class Members. (Fees Mot. at 23-24.)  They also seek $4,500 for "Plaintiff's Individual Payment" for their broad general release of claims.  (Id.)  Class Counsel provides that the named Plaintiffs expended "considerable time conferring with Class Counsel and their investigators, providing factual background and support, analyzing ATS's provided data, and participating in mediation and subsequent settlement discussions."  (Id. at 23.)  Counsel also highlights that named Plaintiffs undertook the financial risk that they could have been responsible for costs awarded to Defendant, and could suffer stigma upon future employment opportunities.  (Id.)

The Court approves an award of a total of $5,000 per named Plaintiff as an incentive award.

### F.    Settlement Administrator Costs

Here, the Agreement states a maximum of $27,000 will be deducted from the settlement fund and paid to the settlement administrator for the costs of administrating the fund.  (Settlement Agreement ¶ 5.5.)  The parties agree to cooperate in the administration process and attempt to minimize the administration costs.  CPT indicated that the total cost of administration to be $14,750.00, including costs to date as well as through the completion of the matter.  (Suppl. Garrido Decl. ¶ 11.)

"Courts regularly award administrative costs associated with providing notice to the class."  Bellinghausen v. Tractor Supply Co., 306 F.R.D. 245, 266

(N.D. Cal. 2015).  The Court finds CPT's requested administrative costs are reasonable and APPROVES Plaintiffs' request for a $14,750.00 payment out of the settlement proceeds to cover administrative costs.

## IV.    CONCLUSION

For the reasons stated above, the Court APPROVES Plaintiffs' Motion for Final Approval of Class Action Settlement.  The Court APPROVES in part and DENIES in part Plaintiffs' Motion for Award of Attorneys' Fees, Incentive Awards, and Reimbursement of Costs.  Class Counsel's request for attorneys' fees in the amount of $200,000 is DENIED; the Court AWARDS Class Counsel attorneys' fees in the amount of $150,000.  The Court also APPROVES a reimbursement for costs and expenses of $8,959.24; a total of $5,000 award per named Plaintiff; and $14,750 to CPT for settlement administrator costs.

**IT IS SO ORDERED.**

Dated:＿＿＿8/3/18＿＿＿

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
Virginia A. Phillips
Chief United States District Judge